UNITED STATES of America,
Appellant,

v.

Florene I. MILLER, and Catherine M. Smith, Executrices of the Estate of Mark Peter Miller, Deceased, Appellees.

UNITED STATES of America,
Appellant,

v.

TERMINAL FLOUR MILLS COMPANY,
Appellee.

Nos. 17008, 17009.

United States Court of Appeals
Ninth Circuit.

May 14, 1962.

Rehearing Denied June 15, 1962.

704

William H. Orrick, Jr., Asst. Atty. Gen., C. E. Luckey, U. S. Atty., Morton Hollander, Howard E. Shapiro, Robert E. Powell, Attorneys, Dept. of Justice, Washington, D. C., for appellant.

R. R. Bullivant, Darrell L. Johnson, Walter H. Pendergrass, Patrick Ford, Portland, Or., for appellee.

Before BARNES, HAMLEY and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge.

These two suits brought against the United States under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 et seq., arose as a result of the mid-air collision of two privately-owned light aircraft near Boeing Field, Seattle. The plaintiffs in one suit are executrices of the estate of Mark Peter Miller, pilot of one of the aircraft, who was killed in the accident. The plaintiff in the other suit is Terminal Flour Mills Company which owned the aircraft operated by Miller.

In both cases the plaintiffs' claims were based on allegations of negligence on the part of Government employees in the control tower at Boeing Field. The United States denied negligence and alleged contributory negligence on the part of Miller. The cases were consolidated for a non-jury trial which resulted in judgments in favor of the plaintiffs, the total award being $123,085.60. The United States appeals.

On June 21, 1956, when this accident occurred, the Civil Aeronautics Administration (CAA) was an agency of the

United States authorized to maintain facilities and employ personnel for the regulation and protection of air traffic.[1] Among such facilities were airport control towers manned by CAA personnel. CAA operated such a tower at Boeing Field.

At the time of the collision the weather was clear, the visibility and ceiling were unlimited, and the wind was calm. These conditions called for aircraft pilots using Boeing Field to proceed under Visual Flight Rules (VFR) as set forth at 14 CFR 60.30–33, and in the Army, Navy and Civilian (ANC) Procedures for the Control of Air Traffic.[2]

Some few minutes before the accident Miller, who was piloting his Beechcraft en route from Portland, Oregon to Boeing Field, radioed the tower from an unknown point south of the field, requesting landing instructions. The tower responded "Beech 06 Charlie cleared to enter right traffic, runway 30, wind calm, report turning base." [3] Upon receipt of these instructions Miller inquired as to whether 30 was the short runway, and he was advised by the tower: "30 is the short runway." No further transmission was made to, or received from, Miller.

At the time of and prior to the accident, the personnel of the tower knew that the pilot of the Cessna, which was the other plane involved in the accident, had with him a student who was practicing "touch-and-go" landings on the field and was following a right traffic pattern.[4] The Cessna was being given landing and take-off instructions by means of light signals from a light gun operated from the tower. The tower personnel assumed that the Cessna was being operated by the student pilot. At least one other aircraft from the Boeing-based Forrest Taylor School of Flying was also using runway 30 for that purpose at that time.

After the above-described radio communication between Miller and the tower, the Cessna and other aircraft based at Boeing Field continued their touch-and-go landings, being directed in this by light gun signals from the tower. Shortly thereafter the Cessna completed a "touch-down" and was climbing to pattern altitude (one thousand feet) on the crosswind leg. The tower personnel did not recall looking at the Cessna after it turned into the crosswind leg.[5]

1. The CAA was created by enactment of the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C.A. § 401 et seq. The 1938 act has been superseded by the Federal Aviation Act of 1958, 72 Stat. 731, 49 U.S.C.A. § 1301 et seq., which abolished the CAA and transferred its functions to the Federal Aviation Agency (FAA). In this opinion the duties of agencies and pilots will be discussed with reference to the 1938 act, which was in force at the time of the collision.

2. VFR weather conditions in control zones are those where the ceiling is one thousand feet and visibility is three miles. Flight Information Manual, Vol. 10, June 15, 1956, promulgated and issued by the CAA. Under VFR, pilots can operate their aircraft under "see and be seen" conditions, i. e., when visibility is such that a pilot can observe other aircraft. The ANC procedures are set forth in the ANC Manual jointly published by the Army, Navy, Air Force and CAA.

3. Neither party makes any point of the fact that Miller was advised to enter "right traffic" instead of "right traffic pattern." It is apparently assumed by all concerned that Miller would understand the advice given as meaning "right traffic pattern." The court so construed the communication from the tower.

4. In a "touch-and-go" landing the pilot brings the airplane down in a normal approach as if he intended to land, and, upon touching its wheels, the pilot applies power to the airplane and takes off again.

5. The four sides, or legs, of any rectangular pattern are separately designated. That which includes the runway is known as the "approach" or "take-off" leg, depending upon whether the aircraft involved is landing or taking off. The opposite leg, which runs parallel to the runway is known as the "downwind leg." The leg which joins the "take-off leg" and the "downwind leg" is the "crosswind leg." The opposite leg, or that joining the "approach leg" to the "downwind leg" is the "base leg."

As the Cessna was climbing along the crosswind leg at a speed of about seventy to ninety miles per hour, the Beechcraft, piloted by Miller, came over the hills to the northeast of the field. The latter plane, which was traveling 140 to 160 miles per hour, was then at an altitude of one thousand to eleven hundred feet, which was slightly higher than the Cessna. It was descending in a turning left bank of about ten to fifteen degrees.

While the Beechcraft was engaged in this maneuver about sixteen hundred to two thousand feet north of the point of impact, the Cessna executed a ninety-degree right turn off of the crosswind leg onto the downwind leg. It had almost completely leveled out on that leg at the time of the collision.

Miller's Beechcraft was visible from the control tower for from eighteen to twenty-four seconds immediately prior to the collision. Had the tower operator seen Miller's plane during that time he would have recognized that it might constitute a hazard to the operation of the Cessna, and that the Cessna might constitute a hazard to the operation of the Beechcraft. Neither operator saw the Beechcraft at any time prior to the collision, nor did they see the collision itself. Hence no effort was made by the tower to inform Miller by radio of the proximity of the Cessna.

On the basis of these facts the trial court found and concluded that the tower operators were negligent in eight different respects, as set out in the margin.[6] The trial court also found and concluded that the negligence of the tower operators was the proximate cause of the collision between the two airplanes. Finally, the court found and concluded, Miller was not contributorily negligent.

Appellant challenges each of these ultimate findings and conclusions as to negligence, proximate cause, and contributory negligence. We turn first to the question of contributory negligence. If the finding and conclusion that Miller was not contributorily negligent cannot stand, the judgment must be reversed, without regard to whether the court was correct as to negligence and proximate cause.

The Government argues that, under the established facts, Miller was contributorily negligent in several respects. One of these, it was asserted, was his violation of the right-of-way rules prescribed by the CAA with regard to converging and overtaking aircraft. The pertinent part of the Air Traffic Rules in question, 14 CFR, part 60, section 60.14(b) and (d), is quoted in the margin.[7]

The basic facts as to the relative positions of the aircraft immediately prior to the collision are not in dispute. The

6. (a) In failing to advise the Beechcraft of the presence of and possibility of collision with the Cessna; (b) In failing to advise the Cessna of the presence of and possibility of collision with the Beechcraft; (c) In failing to maintain a continuous watch over all aircraft within the Control Zone; (d) In allowing the Cessna to continue its touch-and-go landing procedure under circumstances such as might bring it into collision with the Beechcraft; (e) In failing to maintain proper or any control over the Beechcraft and the Cessna so that each would be properly spaced in the traffic pattern; (f) In instructing the Beechcraft that it was cleared to enter the traffic pattern without advising it of the presence of other aircraft in the pattern; (g) In failing to observe and warn the Beechcraft of the presence of the Cessna; (h) In failing to observe and instruct the Beechcraft to alter its course so as to avoid a collision with the Cessna.

7. Section 60.14(b): "Converging. * * * When two or more aircraft of the same category are converging at approximately the same altitude, each aircraft shall give way to the other which is on its right * * *."

Section 60.14(d): "Overtaking. An aircraft that is being overtaken has the right-of-way, and the overtaking aircraft, whether climbing, descending, or in horizontal flight, shall keep out of the way of the other aircraft by altering its course to the right, and no subsequent changes in the relative positions of the two aircraft shall absolve the overtaking aircraft from this obligation until it is entirely past and clear."

Cessna approached the point of impact from the right of Miller's Beechcraft and turned to a course approximately parallel to that of the Beechcraft. The Beechcraft overtook the Cessna, the right wing of the Beechcraft striking the left wing of the Cessna from the rear.

It follows that, both as the aircraft on the right, and as the overtaken aircraft, the Cessna had the right-of-way over the Beechcraft, providing that under the circumstances then existing, the right-of-way rules referred to above were applicable.

But appellees argue that, under conditions then existing these right-of-way rules were not applicable. This argument is predicated upon a "note" which appears under section 60.14, reading in part as follows:

> "Note: Right-of-way rules do not apply when, for reasons beyond the pilot's control, aircraft cannot be seen due to restrictions of visibility
> *   *   *"

Appellees contend that this note governs, and renders the right-of-way rules inapplicable, because the trial court found as a fact that " *   *   * Miller could have maintained a reasonable lookout while approaching the point of impact and not have seen the Cessna because of his limited visibility and the camouflage effect of the background." On the other hand, the Government contends that if it be assumed that this finding of fact is correct, it still would not have excused Miller from performing the duty imposed by the regulations to accord the right of way to the Cessna.[8]

■ It is axiomatic that any regulation should be construed to effectuate the intent of the enacting body. Such intent may be ascertained by considering the language used and the overall purpose of the regulation, and by reflecting on the practical effect of the possible interpretations.

■ The phrases "beyond the pilot's control" and "cannot be seen" appear to contemplate that only physical impossibility, due to such factors as weather or terrain, should excuse application of the right-of-way rules. Had mere difficulty of recognition or perception been intended as the relevant criterion, more appropriate language would have been used.

This conclusion is supported by reference to the specific language of the right-of-way rules. Several pilots testified that it is much more difficult to see an aircraft which is at a lower altitude, where it may be partially camouflaged, than to see an aircraft against the horizon or sky. Presumably this fact was known to the CAA when these rules were promulgated, yet no consideration was given to this factor in prescribing the right-of-way rules.[9]

It is unlikely that the CAA would provide in a rule that the aircraft at a higher altitude must give way to one at a lower altitude, then in a note to the rule excuse the pilot of the former of this duty because it is difficult to observe the latter.

Practical considerations of air safety also tend to support this interpretation of the rules. It is in and around cities, with their concomitant background camouflage, that most airports, and hence most air traffic, will be found. It is most improbable that under these circumstances, where the utmost of vigilance is demanded, the CAA would choose to relieve a pilot of the duty to obey the right-of-way rules because of conditions which are characteristically normal for such an area.

8. Alternatively, the Government contends that the finding itself is clearly erroneous. We do not reach the latter contention.

9. Paragraph (d) of the right-of-way rules states:
" *   *   * An aircraft that is being overtaken has the right-of-way, and the overtaking aircraft, whether climbing, *descending*, or in horizontal flight, shall keep out of the way of the other aircraft *   *   *."
Paragraph (e) of the same rule states:
" *   *   * When two or more aircraft are approaching an airport for the purpose of landing, the aircraft at the *lower* altitude has the right-of-way *   *   *"
(Emphasis added.)

With this construction in mind, we turn to the question of whether the above-quoted finding of fact is sufficient to excuse the duty to comply with the right-of-way rules. This finding refers to two circumstances, either of which assertedly might have prevented Miller, in the exercise of reasonable care, from seeing the Cessna. One of these circumstances was the "camouflage effect of the background" which was found to exist in the area around Boeing Field.

Under certain ideal conditions an object which is camouflaged may be invisible for practical purposes. When such conditions exist one can accurately say that it "cannot be seen." Under the undisputed facts, however, such conditions did not prevail at the time of this collision. The flight path of Miller's plane was at approximately a ninety-degree angle to the path of the Cessna until immediately prior to the impact. The motion of the white-winged Cessna across a stationary background composed of multi-colored objects would have made it visible.

The trial court did not find that, by reason of the camouflage effect, the Cessna was physically invisible. It found only that a "reasonable lookout" might not have revealed the Cessna. This was actually more of a conclusion of law than a finding of fact. The "lookout" which Miller actually maintained obviously did not reveal the Cessna to him. But whether that was a "reasonable" lookout depends upon the legal duty of care imposed upon Miller as a pilot, under the circumstances then existing. We think the court erroneously discounted the degree of care incumbent upon Miller with regard to the lookout to be maintained by him in approaching Boeing Field at that time and place.

It may be that in order to have seen the Cessna against this background, Miller would have had to look thoroughly and diligently in the area in which the Cessna was flying. But if this is the degree of care required of the ordinarily prudent pilot, then such is the standard to which Miller must be held. We believe that this is the standard imposed by the rules, and it is not for the courts to say that the standard is too exacting.

Miller knew, or should have known, that the greatest likelihood of conflicting traffic would come from the precise area in which the Cessna was flying. He should have anticipated the possibility of aircraft on the crosswind leg of the traffic pattern, and should have made a thorough surveillance of that area his prime concern.[10]

10. There was substantial disagreement among the pilots who testified as to whether the phrase "cleared to enter right traffic" should have indicated to Miller that there was traffic in the pattern. The trial court apparently found that it did not indicate that traffic existed, since it found the tower negligent in failing to inform Miller of the other traffic. In our view the language of the regulations requires the pilot to operate on the assumption that there is other traffic, and the testimony of pilots as to their understanding should not be permitted to alter the meaning expressed in the regulations.

14 CFR Part 617, § 617.25(b) (2) (ii) provides:

"A normal clearance to enter the traffic pattern shall be issued to a pilot whenever the controller desires that the aircraft approach the landing area in accordance with current traffic patterns. If a normal clearance to enter traffic pattern is not appropriate for the *existing traffic* conditions * * * an alternate clearance * * * may be used. * * *"

Paragraph (b) (2) (iii) of the same rule provides:

"The clearance to enter traffic pattern * * * is issued when the aircraft is some distance from the field and *traffic conditions* will not permit the issuance of a landing clearance." (Emphasis added.)

A contemporaneous construction of these regulations in Volume 9 of the Fight Information Manual, issued on June 15, 1955, states at page 19:

" * * * Clearance to enter traffic pattern *informs the pilot that traffic exists in the traffic pattern,* but does not constitute landing authority * * * (C)learance to land is ordinarily withheld until the aircraft is in sight of the control tower and no conflicting traffic

In the other part of the finding in question it is stated that Miller's visibility was limited. Inasmuch as the weather was clear and the visibility at the field was unlimited, this finding must relate to the fact that Miller was seated in the left seat and was, just prior to the impact, banking slightly (ten to fifteen degrees) to the left, thus placing the fuselage and right wing in such position as to obscure his vision in the area in which the Cessna was flying. Under appellee's own version of the facts this was the attitude of the Beechcraft. It therefore appears that the probable reason Miller did not see the Cessna was not because of the camouflage effect, but because his aircraft was in such an attitude that he could not even observe the area in which the Cessna was flying.[11]

Assuming that this properly may be called a limitation on visibility, it is nevertheless not sufficient to invoke the exception to the right-of-way rules. This is not a condition beyond the pilot's control; all that was required to remove this limitation was a momentary bank or roll in the opposite direction. As indicated above, Miller should reasonably have anticipated conflicting traffic on his right and below him; he cannot relieve himself of the duty to observe this traffic by voluntarily placing an obstruction in his line of sight.[12]

■ We conclude that neither because of the camouflage effect of the background, nor the position of Miller in the left seat of a left-banking plane, was Miller excused from according the Cessna the right of way under the note to section 60.14 (the right-of-way rule) quoted above.

■ In finding that Miller was not contributorily negligent the trial court may have felt that where a control tower is present to direct traffic, the controllers have the primary responsibility for controlling aircraft so as to prevent colli-

will interfere with the landing." (Emphasis added.)

The Flight Information Manual is a publication of the United States Department of Commerce, Office of Aviation Information. It is primarily designed to provide useful information to pilots, but does not have the force of law. This language was omitted from the 1957 publication of the Flight Manual (subsequent to the aircraft collision in question) apparently for the reason that, by then, aircraft noise as well as aircraft traffic was a reason for requiring adherence to established traffic patterns.

11. In failing properly to clear the area to his right prior to banking to the left, Miller may have violated another provision of the Air Traffic Rules. 14 CFR, Part 60, § 60.12 reads:

"*Careless or reckless operation:* No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

"Note: Examples. * * *

"(c) Lack of vigilance by the pilot to observe and avoid other air traffic. In this respect, the pilot must clear his position prior to starting any maneuver, either on the ground or in flight."

12. L. S. White, one of appellee's witnesses who had wide experience as a pilot testified as follows: "Q. If you are * * *

coming from that direction [northeast, or the route followed by Miller] at pattern altitude, and there is a plane coming on the crosswind leg, you would then feel that you would be in a better position to observe him? A. I think I would be at that particular field. That doesn't apply to all fields because they have different terrain * * * (Y)ou have got your airplane where you can look down * * *. Before making a turn you always roll your plane from one side to another to increase your vision to see what is in the area * * *."

See New York Airways, Inc. v. United States, 2 Cir., 283 F.2d 496, also a suit against the Government based on alleged negligence of the tower operators. The court there stated (at page 498):

"* * * [the trial court] made * * * findings of fact including a finding that 'the pilot did not engage in maneuvers that would have increased visibility through the blind spots.' This and other findings * * * support his conclusion that plaintiff failed to sustain its burden of proving freedom from contributory negligence."

The trial court in this case did not make a finding on this point; however the uncontradicted evidence shows that Miller did not maneuver so as to increase his visibility through the blind spot to his right.

sions, and that pilots are under such circumstances relieved from the duty otherwise placed upon them to accord the right of way as prescribed by rule.

Such a view would be erroneous, because the focal point of ultimate responsibility for the safe operation of aircraft under VFR weather conditions rests with the pilot.[13] Under such conditions he is obligated to observe and avoid other traffic, even if he is flying with a traffic clearance.[14]

The CAA has recognized that with increasing density of traffic, increasing speed, and increasingly complex aircraft which require more attention inside the cockpit, safe operation is facilitated by providing assistance from ground personnel.[15] Such assistance is provided by the towers. The duties of tower operators are delineated in great detail in the manuals provided for the use of those personnel. Some of these duties overlap with the duties which other regulations placed on pilots.[16] It may be this overlap which has led some to believe that if these duties are imposed on the tower operators, the rules governing the duties of pilots under similar circumstances are only applicable where there is no tower.[17]

The rules governing the duties of pilots, however, make it clear that none of those duties are rendered inapplicable merely because a clearance from a tower has been received.[18] It is stated and reiterated that the function of tower per-

---

13. 14 CFR, Part 60, § 60.2 provides, in part:

"The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. * * *"

14. A footnote to section 60.21–1 provides, in part:

"* * * It is the direct responsibility of the pilot to avoid other aircraft when flying in VFR conditions *even with a traffic clearance.* * * *" (Emphasis added.)

15. It is anticipated that at some future time many of the duties presently imposed on pilots may be assumed by ground personnel. In THE ADVANCE IN AIR SAFETY, Report of the Civil Aeronautics Board, May 1958, page 19, it is stated:

"The air traffic control system of the future, unlike our present system, is designed to provide for the separation of all aircraft at all times regardless of weather. This is known as *positive control.*

"There is no element of aviation which has advocated or is ready to advocate positive control *today* of all airspace. To do so with the 'men, money, and machines' now available would instantly ground 85 percent of traffic." (Emphasis in original.)

16. The ANC manual of air traffic control procedures (Revised 2nd Ed., effective July 15, 1955), which is the "bible" for tower operators, provides in part:

"3.400 General—An airport traffic controller shall issue such traffic clearances and other information as are necessary for the prevention of collisions between aircraft under his jurisdiction.

"3.500 * * * (D)ue to the restricted space on and around landing areas, it is often essential that traffic information be issued to aid the pilots to avoid collision between aircraft.

"3.510 Detailed essential local traffic information shall be issued when, in the judgment of the controller, such information is necessary in the interests of safety, or when requested by a pilot."

17. See United States v. Schultetus, 5 Cir., 277 F.2d 322, where the court stated at pages 326–327:

"It seems apparent that the district court had an erroneous concept of the functions and duties of the operators of the control tower. * * * The theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law, have assigned this responsibility to the operators of aircraft." (Footnote omitted.)

18. In addition to Schultetus, at least two other courts have recognized that a clearance from the tower does not relieve the pilot of any of the duties imposed by the regulations. See New York Airways, Inc., v. United States, 2 Cir., 283 F.2d 496, Khourey v. American Airlines, Inc., 170 Ohio St. 310, 164 N.E.2d 402.

A footnote under 14 CFR, Part 60, § 20.21–1, states:

"An air traffic clearance * * * is issued for the purpose of preventing collision between aircraft known to Air Traffic Control and does not constitute authority to violate any provision of the CAR. * * *"

sonnel is merely to assist the pilot in the performance of the duties imposed, not relieve him of those duties.

The optimum of safety is sought to be achieved by imposing concurrent duties on the pilots and tower personnel. In any given case, one, both, or neither could be guilty of a breach of the duties imposed. This view is implicit in the decision of the court in Eastern Air Lines v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62, affirmed, sub nom., United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796. The ultimate result reached in that case recognized that both the Government and the airline had concurrently breached their duties, and each was held liable.

We conclude that Miller was not excused by reason of the control tower operation from his duty, under the VFR weather conditions prevailing at the time of the collision, to give way to the Cessna which was in the favored position, or from doing whatever was necessary to clear the area in which the Cessna was flying.

Miller's violation of the right-of-way rules was negligence which proximately contributed to this accident and therefore precluded any recovery for his wrongful death under the controlling law.[19]

In view of this conclusion, it is unnecessary for us to decide whether Miller was contributorily negligent in any of the other respects asserted by the Government.[20] It is likewise unnecessary to decide whether the trial court erred in finding and concluding that the tower operators were negligent in one or more of the eight respects listed in footnote 6, and in finding and concluding that such negligence was a proximate cause of the collision.

The judgment is reversed.

---

19. See, e. g., Bissell v. Seattle Vancouver Motor Freight, 25 Wash.2d 68, 168 P.2d 390. Cf. Hall v. Osell, 102 Cal.App.2d 849, 228 P.2d 293; Ratton v. Busby, 230 Ark. 667, 326 S.W.2d 889, 76 A.L.R.2d 751.

The statutes of Washington (RCW 14.16.050), provide:

"* * * it shall be unlawful for any person to navigate any aircraft within this state otherwise than in conformity with said [Federal] air traffic rules."

20. The other respects in which, it is asserted, Miller was contributorily negligent, are as follows: (1) failing to enter the traffic pattern at the prescribed point or altitude; (2) entering the traffic pattern at excessive speed, and (3) entering the traffic pattern in an improper manner, i. e., in a ten to fifteen degree left bank.