342 F.2d 581
 Siesel A. FRANKLIN and Helen W. Franklin, Plaintiffs
(Cross-Appellant and Appellee),
v.
UNITED STATES of America and Hugh Riddle, Jr., and Chicago
Helicopter Airways, Inc., and Richard R.
Creighton, Defendants
(Appellants-Cross-Appellees).
 Nos. 14609-14611.
 United States Court of Appeals Seventh Circuit.
 Feb. 17, 1965, Rehearing Denied April 7, 1965, en banc.
 
 Harry L. Arkin, Denver, Colo., Harold Shabelman, Chicago, Ill., for plaintiffs Franklin, Lindner & Davis, Denver, Colo., Belli, Ashe & Gerry, San Francisco, Cal., of counsel.
 Morton Hollander, Chief, Appellate Section, U.S. Dept. of Justice, Lawrence R. Schneider, Atty., John W. Douglas, Asst. Atty. Gen., Edward V. Hanrahan, U.S. Atty., Sherman L. Cohn, Atty., Dept. of Justice, Washington, D.C., for the United States.
 Gordon R. Close, Lord, Bissell & Brook, Chicago, Ill., for Chicago Helicopter Airways, Inc. and Richard Creighton, Jay M. Smyser, Chicago, Ill., of counsel.
 Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.
 DUFFY, Circuit Judge.
 
 
 1
 These suits were brought by Siesel A. Franklin and Helen W. Franklin, his wife for damages resulting from the crash of Franklin's Beechcraft Bonanza plane on March 31, 1959, as the plane was approaching the runway at Meigs Field, Chicago. In the first suit, the Franklins claimed defendant Chicago Helicopter Airways, Inc. (Airways) was negligent in the operation of one of its helicopters which was piloted by defendant Creighton. In the second suit, the defendants charged with negligence were the United States of America and Hugh Riddle, Jr., the latter being the air traffic controller in the tower at Meigs Field.
 
 
 2
 Plaintiffs' theory of recovery was that the helicopter had crossed the Beechcraft's flight path in such a way as to leave a wake turbulence which caused the Beechcraft to crash. In the second suit, plaintiffs allege the United States and its air traffic controller were negligent for failing to keep a greater separation between the craft in anticipation of the turbulence problem, and in failing to warn Franklin of the helicopter's presence. There were also allegations that the tower control operator did not properly keep the helicopter within his view.
 
 
 3
 The two suits were consolidated for trial and were tried to the Court. The District Court entered judgment in favor of the plaintiff, Helen W. Franklin, finding both Airways and the United States, as well as observer Riddle to have been negligent, but denied recovery to Siesel A. Franklin who was found to be contributorily negligent. Siesel A. Franklin filed a cross-appeal claiming the District Court erred as a matter of law in its conclusion that said plaintiff was contributorily negligent.
 
 
 4
 About 7:15 on the morning of March 31, 1959, Siesel A. Franklin then 61 years of age, and his wife Helen, left the airport at Denver, Colorado, destined for Chicago, Illinois, in a Beechcraft Bonanza airplane which Franklin had purchased the previous day. Franklin was an experienced pilot who had flown over 10,000 hours. For years he had acted as a pilot instructor. In more recent years, Franklin had used his airplane in calling upon customers in his lumber business. The new Bonanza was a single engine land model. This plane had a more powerful engine than planes previously owned by Franklin.
 
 
 5
 About ten hours after Franklin had left his home on March 31, 1959, his plane was about fifteen miles west of Meigs Field airport. Franklin made radio contact with the control tower at Meigs Field and requested landing instructions. The control tower asked whether he wanted 'right or left approach.' Franklin requested a lefthand approach and the tower operator asked him to call him when he reached the 'downwind leg' of his landing pattern.
 
 
 6
 Considering the four sides or legs of a rectangular landing pattern, the leg that leads into the runway is known as the 'final approach.' The opposite leg which runs parallel to the runway, is known as the 'downwind leg.' The leg which joins the downwind leg with the final approach is the 'base leg.' The remaining leg leading to the downwind leg is known as the 'crosswind leg.'
 
 
 7
 On Franklin's approach to Meigs Field, his crosswind leg brought him from the west out over Lake Michigan at a point south of Meigs Field. His downwind leg brought him north over Lake Michigan, parallel to Meigs Field. North of the Planetarium he turned into the base leg. He followed the base leg to a point about 1450 feet north of the entrance to the runway. It was at this point, Franklin testified, he first saw the helicopter which already was on the ground. Riddle, the control tower operator, estimated Franklin's position was 3/4 of a mile north of the runway when the helicopter touched down. Witness Drew testified the helicopter was unloading passengers when the Bonanza crashed.
 
 
 8
 At all times during Franklin's approach, the visibility was good. It was stipulated that at the time of the accident the wind was from the east-southeast at eight knots.
 
 
 9
 About the time Franklin was approaching Meigs Field from the west, an S-58 helicopter owned by Airways and piloted by Richard Creighton was approaching from the west in an oval right turn pattern that took it first north of the airport and then southwest to land on a diagonal taxiway adjacent to the main runway. Pursuant to normal procedure, the helicopter was cleared by the tower to land on the diagonal taxiway leading to the terminal. When the helicopter passed the end of the lagoon, it made a second call to the tower and was again cleared to land.
 
 
 10
 There was testimony that the helicopter passed over a portion of the runway in making its approach to the taxiway. We accept this as the testimony most favorable to the plaintiffs. The control tower operator testified 'The helicopter was not warned to stay clear of the runway in coming in on the diagonal, because I saw no conflict.' The tower operator also testified 'The helicopter would not be violating any rules, regulations or directions whatsoever if he came directly across the runway. He wouldn't even have to ask for clearance.'
 
 
 11
 After observing the helicopter on the ground, Franklin continued on his final approach toward the north end of the runway. He passed over four rows of trees at an altitude of some eighty feet above the ground. Somewhere between the row of trees and the end of the runway, his Beechcraft Bonanza, which was then some twenty to thirty feet above the ground, began to 'mush' and 'settle' very rapidly. The right wing of the plane contacted the ground at a point about 300 feet north of the runway edge. The plane then cartwheeled to a spot just short of the fence on the north end of the runway.
 
 
 12
 The primary question is whether the Franklin plane crashed as the result of a slow speed stall or whether it crashed as a result of encountering turbulences left in the wake of the helicopter. There is a further question, if the crash were caused by the turbulence, did the operation of the helicopter in landing as it did, constitute actionable negligence by any defendant herein.
 
 
 13
 Witnesses Bodenhamer and Drew were sitting in an automobile near the runway at the time of the crash. They were waiting for the Franklin Bonanza to land so they could drive across the runway to the plane parking area which was due east from where they stopped their automobile. They wished to inspect a plane which Mr. Drew contemplated purchasing. Bodenhamer observed the approach of Franklin's plane. He and Drew had an unobstructed view of the runway being approached by Franklin. He testified 'He (Franklin) actually stalled the airplane.' He also testified that he did not hear Franklin apply any emergency throttle. Drew, who had 2000 hours' experience in Beechcraft Bonanza planes, also watched the plane approach and testified that, in his opinion '* * * the man stalled the airplane * * *.' He testified when the Bonanza started to spin, he remarked: 'For God's sake, put on some power.' Franklin admitted that if an aircraft such as his was in a slow speed stall, it would tend to roll to one side.
 
 
 14
 Boone, a plaintiff's witness who was standing in the parking lot when the plane crashed, testified 'It is clear that I did not hear any power applied and I would say his engine was idling as he came in, he didn't appear to have much power as he was coming in * * *'
 
 
 15
 An important element is that both plaintiffs' and defendants' experts agreed that any disturbance in the air, left in the wake of the helicopter, would become a part of the air mass and move in the direction and at the speed of the wind. It was stipulated that the wind was from the east-southeast at eight knots, hence any turbulence from the helicopter would have drifted in a west-northwest direction at a speed of eight knots or about 13.5 feet per second. This would be in a direction away from that part of the runway on which Franklin was attempting to land.
 
 
 16
 The communications between the control tower and the Bonanza, and the control tower and the helicopter were on the Meigs Field frequency of 121.3 megacycles. As he approached, Franklin kept his radio set tuned to the tower frequency, and its transmissions were amplified over a loud speaker. No explanation is given why Franklin could not or did not hear the landing instructions given by the tower operator to the helicopter.
 
 
 17
 Witnesses gave varying estimates of area where Franklin experienced difficulty. Plaintiffs' witness Boone estimated the helicopter preceded the Franklin plane by 30-40-60 seconds; others estimated as low as 15-20 seconds. If the control tower operators' observation was correct in his estimate that the Franklin plane was 3/4 of a mile north of the runway when the helicopter passed the area, there would be an interval of about twenty-four seconds between the time the helicopter passed the point where Franklin experienced difficulty, and the time the Franklin plane reached the same spot.
 
 
 18
 The District Court, hearing the case without a jury, held the helicopter had been negligently operated because it followed an 'unnecessary' path in landing at the point where it had been cleared to land. The District Court also found the control tower operator negligent in failing to advise the Franklin plane of what the District Court thought Franklin should have been aware of anyway, due to his radio contact with the tower, and in failing to keep the helicopter in view. The District Court awarded Mrs. Franklin $83,095.22 damages but denied Siesel A. Franklin any recovery on the ground that he had been contributorily negligent.
 
 
 19
 ALLEGED NEGLIGENCE OF TOWER OPERATOR AND OF THE UNITED STATES
 
 
 20
 Assuming arguendo, that Franklin's plane did run into a turbulent wake of the S-58 helicopter, we think it is clear there was no negligence on the part of Hugh Riddle, the tower operator, nor by Airways and its pilot Creighton.
 
 
 21
 It is conceded that there was no evidence that the helicopter was operated in a careless or reckless manner so as to endanger the lives or property of others. The helicopter was cleared to land and when the pilot Creighton learned there was another aircraft in the area, he asked for and received a second clearance. He landed on the taxiway as directed, and at no time did the helicopter land or touch down on the runway.
 
 
 22
 We think the District Court was in error in holding Riddle, the operator of the control tower 1) had a duty to advise the pilot of the Beechcraft of the presence of the helicopter in the control zone; 2) in presuming or assuming the tower operator was aware of a helicopter turbulence problem, and 3) that he did not keep the helicopter within his view.
 
 
 23
 The findings of the District Court must be considered in the light of the general principles of negligence applicable to air traffic control. In the absence of a special statute, the ordinary rules of tort law apply to aircraft accidents. United States v. Miller, 9 Cir., 303 F.2d 703. We must be guided by the standards of negligence under the laws of Illinois. Thus, before negligence can be imputed to a defendant by a plaintiff, there must have been owed a duty by the defendant to the plaintiff. Furthermore, liability will attach only if the resulting injury could reasonably have been anticipated or reasonably foreseen by the defendant. Kerby v. Chicago Motor Coach Co.,28 Ill.App.2d 259, 264, 171 N.E.2d 412, 416.
 
 
 24
 In the instant case, the two aircrafts were approaching Meigs Field from different directions; they were cleared to land on different parts of the airfield and their respective flight patterns indicated the helicopter would touch down well ahead of theBeechcraft.
 
 
 25
 In view of the longitudinal separation of at least 2200 feet between the aircrafts, there was not apparent to the tower operator or others, any possible conflict between the two aircrafts. The distance was far greater than required by the CAA regulations, 14 CFR 617.26a and the ANC Manual.[1] Moreover, Mr. Franklin was well aware of the helicopter's presence. He testified he saw it on the ground taxiing toward the terminal when he (Franklin) was 700 feet north of the tree line. Furthermore, when Franklin heard the tower communications with the helicopter, he was obviously aware that there was another aircraft in the control zone.
 
 
 26
 The District Court must necessarily have assumed that the tower operator knew or should have known that helicopter wake vortices constituted a potential hazard to the operation of other aircraft.
 
 
 27
 As of this date, it is an accepted scientific fact that air-borne helicopters do generate a wake containing turbulent forces called vortices. But it is just as clear that in March 1959, neither Mr. Riddle nor anyone else connected with the aviation community or industry knew or had reason to know of the effects of a helicopter wake turbulence. There was no reason for anyone connected with aviation to believe otherwise prior to March 1959, as there was testimony that there never had been a reported instance of an aircraft encountering difficulty as a result of operating in close proximity behind a helicopter.
 
 
 28
 While information had been issued in 1959 by the CAA, and by the manufacturer of Beechcraft airplanes which warned pilots of the effect of turbulence generated by 'large, multi-engine or jet aircraft' there was no such information available concerning the effects of turbulence generated by helicopters.
 
 
 29
 The first known helicopter wake turbulence tests were conducted by the National Aeronautics and Space Administration in 1962. The results of these tests were made known in March 1962. The only other known tests were conducted in 1963 under the supervision of Mr. Theodore Sanford, the Program Manager of Research and Development at the FAA. Mr. Sanford was the Government's expert in the instant case.
 
 
 30
 We hold that as helicopter wake turbulence problems were unknown to Hugh Riddle on March 31, 1959, and as they were also unknown to the industry at large at that time, there was no duty on the part of Riddle to warn Siesel Franklin of the helicopter's presence prior to the time that Franklin attempted to land at Meigs Field.
 
 
 31
 The District Court found that the operator of the tower was negligent in that he 'took his attention from the helicopter while it was still north and west of the runway and thereafter did not look in the direction of the north end of the field until after the Franklin airplane had crashed.'
 
 
 32
 There is no support in the record for this finding. But, if there were, an air traffic controller is not supposed to give his attention to any one aircraft in the control zone if other aircraft are present. All aircraft within the control zone should have the controller's attention. See New York Airways, Inc. v. United States, 2 Cir., 283 F.2d 496, 498.
 
 
 33
 We think Riddle's conduct in assisting the pilots of the two aircrafts was reasonable and proper in every respect. The two aircrafts never came close to colliding with each other. We hold that neither Riddle, the tower operator nor the United States, was negligent in any respect.
 
 
 34
 A further reason why the judgment below cannot stand is that it is clear from the record that the crash of plaintiffs' Beechcraft could not have been caused by an encounter with the wake turbulence generated by Airways' helicopter. Both Professor Meyer and Mr. Sanford testified the vortices generated by a helicopter become 'encapsulated in the air' and drift at the same speed and in the same direction as the wind. It was established the wind was blowing from the east-southeast at eight knots. Therefore, the whole disturbance pattern, if any, generated by the helicopter moved in a west-northwesterly direction at the rate of 13.5 feet per second. Assuming the helicopter on its last turn to the south did pass at or near the point where the Beechcraft encountered difficulty, any disturbance there created by the helicopter would have passed 202 feet to the west-northwest if fifteen seconds only had intervened between the time the helicopter passed and the Beechcraft arrived.[2] The drifting, invisible helicopter wake at that distance from the runway approach, could not have disturbed the Beechcraft. Furthermore, Professor Meyer and Mr. Sanford each testified the Beechcraft would have had to traverse through the 'up' forces in the helicopter's wake before encountering sufficient down forces to cause the plane to 'mush' or 'settle' to the ground. There is not a shred of evidence in this record that the Beechcraft encountered any 'up' forces in its approach to the runway of Meigs Field.
 
 
 35
 That portion of the judgment below finding Siesel A. Franklin guilty of contributory negligence, is affirmed. That portion of the judgment finding Hugh Riddle, Jr., the United States of America, Chicago Helicopter Airways, Inc. and Richard R. Creighton guilty of negligence, is reversed, and the cause is remanded to the District Court to dismiss the claims asserted in the complaint against all of the defendants herein.
 
 
 
 [1]
 Army, Navy and Civilian Procedures for control of aircraft. This Manual is a joint publication of the Army, Navy, Air Force and CAA and has been described as the 'Bible for Tower Operators.' United States v. Miller, supra, at page 710
 
 
 [2]
 There was much credible testimony to show that a period of 25 seconds or more had elapsed, but we consider only the testimony most favorable to the plaintiff