Gladys DYER, Personal Representative of the Estate of Jon Keith Dyer, Deceased; Central National Insurance Company of Omaha, Nebraska, a foreign corporation, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. No. 82–1340–FR.

United States District Court, D. Oregon.

Sept. 20, 1985.

On Motion to Recover Costs Nov. 20, 1985.

---

Jonathan M. Hoffman, Martin, Bischoff, Templeton, Biggs & Ericsson, Portland, Or., for plaintiff Dyer.

Donald Bowerman, Oregon City, Or., for plaintiff Central Nat.

Richard K. Willard, Acting Asst. Atty. Gen., Charles H. Turner, U.S. Atty., William B. Borgeson, Asst. U.S. Atty., Portland, Or., Susan M.H. Gillett, Trial Atty., Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for U.S.

## FINDINGS OF FACT

## CONCLUSIONS OF LAW

FRYE, District Judge:

## INTRODUCTION

On March 14, 1981, Jon Keith Dyer was killed when the Piper Turbo Arrow aircraft

in which he was a passenger crashed at the Clatsop County Airport in Astoria, Oregon. His mother, Gladys Dyer, is the plaintiff in this action, together with the Central National Insurance Company of Omaha, Nebraska, the insurer of the aircraft.[1]

Plaintiffs bring this action against the United States of America for wrongful death pursuant to the Federal Tort Claims Act. 28 U.S.C. §§ 1346(d), 2671, et seq. Plaintiffs contend that the crash occurred when the aircraft encountered wake turbulence from a United States Coast Guard helicopter. Plaintiffs contend that the Coast Guard's negligence was a substantial factor in the cause of the crash and the death of Jon Dyer. The government contends that Coast Guard personnel acted reasonably and lawfully at all times and that there was no causal connection between any actions of the Coast Guard and the crash. The government asserts that the crash was caused solely by the negligence of the aircraft's pilot, John Robert Franklin, Jr.

This court has jurisdiction over the subject matter and the parties in this action. Prior to filing this action, plaintiffs exhausted their administrative remedies by filing a timely administrative complaint and instituting this action in a timely manner after the administrative claim was denied. 28 U.S.C. § 2675(a).

On April 30, 1985, the matter was tried to the court. The trial lasted eight days, with each side presenting numerous factual and expert witnesses. The court then took the matter under advisement.

## FINDINGS OF FACT

On March 14, 1981, Jon Dyer, John R. Franklin, Cathy Chivavetta, and Patty Cvetich left Aurora State Air Park, east of Portland, Oregon, on a pleasure flight to Astoria, Oregon, intending to visit Jon Dyer's brothers and parents. Dyer occupied the right front seat. Franklin, the pilot, was seated in the left front seat. Although Franklin was a relatively inexperienced pilot with approximately 300 hours of flight time (29.7 of those hours being in a Piper Turbo Arrow), Franklin was properly certified and qualified as a private pilot for single engine, land aircraft.

The flight went smoothly. Franklin testified as to what happened as the Piper Turbo Arrow approached the Clatsop County airport:

A. Well, I saw the helicopter just as I was coming in at the 45-degree angle. I saw the helicopter at the end of runway 21, getting ready to approach the threshold, the very end of the runway itself. That's when I first noticed it.

Q. Okay. And after you saw the helicopter, could you explain what you did and why? Well, first explain what you did upon seeing the helicopter.

A. Well, I knew it was a fairly large helicopter, much larger than my own aircraft, so I just figured it had something, it had something, but I wasn't sure what. So I extended my patterns to allow whatever it was to dissipate.

Q. Now, when you say extend your pattern, could you explain what you mean?

A. I made the downward leg much longer than normal so I was quite a ways out from the airport. Then I turned base leg and then final.

Q. All right. Now, as you were—do you remember the precise speeds that you were actually going—let me ask it this way: Are there particular speeds that you try to go on different legs of the traffic pattern?

A. On this particular instance I tried to go slower than normal because still I wasn't sure about the helicopter.

The helicopter was an HH–3 Coast Guard helicopter which was returning to the Clatsop County airport from a search and rescue mission. Four crew members were aboard, including the pilot, Lt. Commander Thomas Preston; the co-pilot, Lt. Commander Paul Gruver; the avionicsman, Pet-

---

1. Any reference to plaintiffs includes both Gladys Dyer and the insurer of the aircraft.

ty Officer Jonathan Major, and the flight mechanic, Petty Officer John Nicholl.

The Clatsop County airport is unique in that it is an uncontrolled airport that is jointly used by general aviation aircraft and large military aircraft. The airport has no control tower. Aircraft operate under visual flight rules and provide their own sequencing and separation. Ordinarily pilots make their positions and intentions known to other aircraft on a common radio frequency called UNICOM.

On the day of the accident, the HH–3 Coast Guard helicopter approached the airport from the southwest, but east of runway 21. Officer Gruver testified that he saw a T-tail plane like the Piper Turbo Arrow to the west of the airport as the helicopter approached for landing. He testified that it did not appear to him that the plane was intending to land because it was approximately two miles northwest of the airport heading away from the airport, and he heard no transmissions on UNICOM to indicate that an airplane was in the pattern for landing.

The HH–3 helicopter continued in its flight pattern, using a left hand approach pattern, approaching the airport from the southeast on its downwind leg, turning left for the base leg and left again for the final approach crossing the threshold of runway 21 at approximately 55 knots and 350 feet above ground level. The helicopter then made a steady and continuous reduction in airspeed and altitude, touching down at the midpoint where all runways intersect, with virtually no forward speed, known as a "no hover" landing.

Approximately two minutes later, the Piper Turbo Arrow crossed the threshold of Runway 21 on its way to land. Franklin described the ensuing moments as follows:

A. Well, I did another—another scan of the airport. I still didn't notice anything. So I assumed that everything was normal; it was okay. And I was just about to go into the flare when the turbulence hit.

Q. Okay. When you say the turbulence, tell me what the airplane did.

A. At first it went over to the left like it was almost on its side, and then I remember it going—I tried to add more power so I could perhaps go around, but it just didn't seem like anything happened, and it went to the right again and the next thing I knew the ground was coming up.

Jon Dyer was fatally injured in the crash that followed, and the Piper Turbo Arrow was destroyed.

Plaintiffs contend that the Coast Guard helicopter pilots were negligent in the following particulars:

1. In failing to avoid the flow of fixed-wing aircraft as required by 14 C.F.R. § 91.89(a)(2).

2. In failing to plan or adjust their flight path to minimize vortex exposure to other aircraft, as required by paragraph 544(d) of the Airmen's Information Manual.

3. In failing to comply with Coast Guard Instruction 3100.1H or such similar Instruction then in effect, by failing to fly a right-hand traffic pattern to the airport and avoid conflict with fixed-wing traffic, even though avoiding such a conflict was feasible.

4. In failing to conform its degree of care to the standards of other helicopter operators by avoiding the fixed-wing traffic pattern and the active runway.

5. In failing to warn other operators of the hazards of their mode of operation, either by broadcasting a wake turbulence warning on UNICOM or requesting issuance of a NOTAM.

Plaintiffs contend that the Coast Guard pilots' negligence was a substantial factor in causing the crash of the Piper Turbo Arrow and the death of Jon Dyer.

The government first contends that the plaintiffs have failed to show by a preponderance of the evidence that wake turbulence generated by the HH–3 helicopter was the cause of the crash. The government also contends that even if the accident was caused by wake turbulence, the Piper Turbo Arrow was not in the standard

traffic pattern, and the Coast Guard pilots could not have reasonably forseen that it would get into the standard traffic pattern and land. Therefore, the government asserts that the Coast Guard pilots had no duty to act differently than they did act on the day of the accident. The government contends that the crash was caused solely by the negligence of the Piper Turbo Arrow pilot in that (1) he flew his airplane in a careless fashion, (2) reduced his speed so as to cause the airplane to stall, and (3) failed to follow proper wake turbulence procedures.

## ANALYSIS

In order to prove negligence, the plaintiffs must show by a preponderance of the evidence that the Coast Guard had a duty to them, that it breached that duty, and that the breach of that duty was a substantial cause of the damages incurred by them. *Bilderback v. United States*, 558 F.Supp. 903 (D.Or.1982).

### Causation

■ The court turns first to the issue of causation. Plaintiffs contend that the crash of the Piper Turbo Arrow was caused by an encounter with the wake turbulence of the HH-3 helicopter. Defendant contends that wake turbulence did not cause the crash but that the crash was caused by a stall due solely to pilot error. If wake turbulence was not the cause of the crash, then the government cannot be held liable.

The Airmen's Information Manual (AIM) describes how wake turbulence is created:

Lift is generated by the creation of a pressure differential over the wing surface. The lowest pressure occurs over the upper wing surface and the highest pressure under the wing. The pressure differential triggers the roll of the airflow aft of the wing resulting in swirling air masses trailing downstream of the wing tips. After the roll up is completed, the wake consists of two counter-rotating cylindrical vortices.

The strength of these vortices is primarily a function of the weight and the velocity of the generating aircraft. As an aircraft slows down, it needs to generate more lift in order to continue in flight. As the aircraft generates more lift at slower speeds, the pressure differential above and below the rotor blades increases. For this reason, slow-moving helicopters may be capable of generating wakes of greater intensity than airplanes of similar weight. A report prepared by the government in 1979 explains in part:

At 38,000 pounds, the HH-53 [2] helicopter is not a "heavy" configuration according to the separation criteria as specified by the FAA. Yet, at the lower speed as we shall see, more vorticity is needed to generate a given amount of lift. Also, a rotor seems to generate more vorticity than a wing for the same lift because a helicopter performs a landing at speeds significantly below that of an aircraft. The vortical wake strength trailed behind a HH-53 flying at 60 knots is similar to that trailed behind a KC-135 or Boeing 707 in landing approach.

Defendant's Exhibit 206, p. 6.

It is difficult, if not impossible, to accurately determine the amount of time it takes for the wake turbulence of a helicopter to dissipate. Factors that affect the rate of wake turbulence decay include: time of day, weather conditions, and the speed and size of the aircraft. Most of the technical work done in the area of wake turbulence relates to airplanes and not to helicopters. In addition, the emphasis in the training of pilots is placed upon fixed wing and not rotary blade aircraft such as helicopters. Despite the fact that the term "aircraft" used in the AIM includes both airplanes and rotary blade aircraft, the emphasis is upon airplanes. An encounter between a small fixed-wing airplane and a large helicopter in an uncontrolled airfield where spacing is not dictated by a control tower is uncommon, if not unique. Neither

2. While the HH-53 helicopter referred to in the report weighs approximately twice as much as the HH-3 helicopter involved here, the same principles are applicable.

plaintiffs' expert pilot, Melvin Goodat, nor the defendant's expert pilot, Richard Taylor, could recall ever having heard of a large helicopter operating in a standard traffic pattern at an uncontrolled field (other than Astoria), despite the fact that the two pilots together have 25,000 hours of flight time.

With these limitations in mind, the court addresses the evidence as to the wake turbulence generated by the HH–3 helicopter. Plaintiffs' expert witness, David Clark, testified that based upon the location of the helicopter and the airplane and the weather conditions on the day of the accident, there is a high probability that the airplane crashed as a result of the wake turbulence generated by the United States Coast Guard helicopter. Clark used generally accepted mathematical modeling techniques and the approximate range of conditions to develop a series of computer-generated snapshots of the HH–3 helicopter wake development and decay. Based upon the testimony of Clark, the plaintiffs contend that vortices of helicopters such as the HH–3 helicopter here, weighing in excess of 15,000 pounds, can continue to be a hazard to small aircraft approximately two minutes after they are generated. Plaintiffs contend that the Piper Turbo Arrow crossed the threshold within that time and encountered the wake of the HH–3 helicopter.

The government offered the testimony of Joseph Tymczyszyn to rebut the opinion offered by Clark. Tymczyszyn estimated that the wake vortex from the HH–3 helicopter would dissipate after 60–70 seconds. His opinion was based upon (1) his knowledge and experience as a test pilot, and (2) the report from the only flight test he was aware of involving an airplane behind a helicopter, which was made in 1962 by NASA (Def.Ex.232) and which concluded that a one minute separation between the helicopter and the airplane was adequate. Tymczyszyn testified that in his opinion the crash was caused by a stall in the Piper Turbo Arrow.

The court accepts plaintiffs' evidence that the wake turbulence generated by the HH–3 helicopter on the day of the accident was a hazard to small airplanes, such as the Piper Turbo Arrow, crossing the threshold of the runway within two minutes of the helicopter. Evidence from witnesses at the scene of the accident indicates that the Piper Turbo Arrow followed closely behind the HH–3 helicopter and crossed the threshold within the hazardous period. The court finds, therefore, that wake turbulence was the cause of the crash. The court also finds, however, that the pilot of the Piper Turbo Arrow failed in his duty to avoid the wake turbulence of the HH–3 helicopter. Franklin testified that he had extended his flight pattern and slowed his speed in order to avoid the wake turbulence from the HH–3 helicopter. (*See, supra,* pages 752–753). Obviously, he misjudged what he had to do to avoid the wake turbulence. Had it not been for Franklin's negligence, the airplane crash would never have occurred.

The court must now determine whether the Coast Guard also acted negligently on the day in question, and if so, whether that negligence was a substantial contributing factor in the cause of the crash of the airplane. If both Franklin and the Coast Guard were negligent and their negligence combined to cause the crash, then the negligence of the Coast Guard was concurrent with Franklin's negligence, and the Coast Guard is not insulated from liability.

### *Federal Aviation Regulation § 91.89(a)(2)*

### *Paragraph 544(d) of the Airmen's Information Manual (AIM)*

■ Plaintiffs first contend that the Coast Guard's actions on the day of the accident constitute negligence *per se* in that the HH–3 helicopter violated Federal Aviation Regulation (FAR) 14 C.F.R. § 91.89(a)(2) which provides:

Each person operating an aircraft to or from an airport without an operating control tower shall—

.      .      .      .      .

(2) In the case of a helicopter approaching to land, avoid the flow of fixed-wing aircraft;

Plaintiffs argue that the purpose of FAR § 91.89(a)(2) is to promote air safety by recognizing that the intermixing of helicopters and airplanes in the same standard landing pattern creates a potential hazard because of the different operating characteristics of the two types of aircraft. Since a helicopter has superior maneuverability and is able to land in many places, plaintiffs argue that the intent of the regulation is to separate the two types of aircraft by excluding helicopters from the standard traffic pattern of fixed wing airplanes.

At the time of this accident, the Clatsop County airport had a standard left hand traffic pattern established by airport regulations for each of its three runways—that is, a traffic pattern in which all turns are made to the left. The operator of the HH–3 helicopter used the standard left hand traffic pattern on the day of the accident.

Plaintiffs offered the expert testimony of Floyd Goodat, a designated flight examiner and experienced transport pilot, to support their claim that the Coast Guard violated FAR § 91.89(a)(2). Goodat testified that it was poor practice for the Coast Guard helicopter to be in the standard traffic pattern for fixed wing airplanes at the Astoria airfield. Goodat testified that in his opinion FAR § 91.89(a)(2) requires the pilot of a helicopter landing at Astoria to avoid the standard traffic pattern in which airplanes are expected to operate, whether or not there are aircraft in that pattern at the time that the helicopter arrives in the airport environment. Goodat said that in his opinion this is the only reasonable interpretation of FAR § 91.89(a)(2) because a pilot of a helicopter cannot always rely upon visual sighting, and, in order to *assure safety*, he must assume that there is a fixed wing airplane in the standard traffic pattern intending to land.

The government concedes that the HH–3 helicopter was in the standard traffic pattern for fixed wing aircraft but contends that FAR § 91.89(a)(2) did not place any duty upon the pilot of the helicopter on the day of the accident to avoid landing in the standard traffic pattern because (1) there was no flow of fixed wing traffic on the day of the crash; and (2) it was not reasonably forseeable to the pilot and co-pilot of the helicopter that the pilot of the Piper Turbo Arrow would get into the flow of traffic at the Clatsop County airport. The government contends that there must be airplanes *in* the standard traffic pattern in order for there to be a "flow" of fixed wing traffic at an airport, and on the day of this accident there was no airplane in the flow of the standard traffic pattern.

The government further argues that FAR § 91.89(a)(2) merely requires that a helicopter entering the standard traffic pattern must enter in such a way as to avoid airplanes. In other words, according to the government, a helicopter complies with FAR § 91.89(a)(2) by entering the standard traffic pattern ahead of a fixed wing airplane (as in this case), behind a fixed wing airplane, or by flying a right hand pattern when fixed wing airplanes are approaching in the standard left hand traffic pattern.

To support its position, the government offered the expert testimony of Joe A. Redwine, a helicopter and fixed wing aircraft pilot employed by the Federal Aviation Association as an aviation safety inspector. Redwine testified that the language now found in FAR § 91.89(a)(2) was first added to Civil Air Regulation 60.18 in 1961. Redwine testified that there is no explanation in the legislative history as to why the language was added, but that in his opinion it had nothing to do with wake turbulence avoidance. Redwine explained that in the early 1960's most helicopters were small, slow, and not very visible, thereby creating a collision hazard. It is Redwine's opinion that FAR § 91.89(a)(2) was intended *to permit* helicopter pilots to fly other than standard traffic patterns for fixed wing airplanes *if they needed to do so in order to avoid collisions* and if they were on special training flights. Redwine testified that in his opinion there had to be traffic present

in a standard traffic pattern to constitute a "flow," and that in this case, the Piper Turbo Arrow was not in the standard traffic pattern because it was wide of the standard traffic pattern and, therefore, there was no "flow" of fixed wing aircraft for the HH–3 helicopter to avoid.

The court finds that the Piper Turbo Arrow was not in the flow of fixed wing aircraft at the time the HH–3 helicopter entered the threshold for landing and that the operators of the HH–3 helicopter could not have reasonably foreseen that Franklin would enter the standard traffic pattern for landing at the Clatsop County airport. The court finds that Franklin had either taken his airplane out of the standard traffic pattern in order to position the airplane far enough behind the helicopter to avoid its wake turbulence, or had never been in the standard traffic pattern at the time the HH–3 helicopter entered the threshhold for landing. The court finds that Franklin miscalculated times and distances, and that his efforts to avoid the wake turbulence of the HH–3 helicopter failed. He was too close behind the HH–3 helicopter to avoid its wake turbulence.

Plaintiffs also contend that the pilot of the HH–3 helicopter violated paragraph 544(d) of the AIM. That paragraph states:

Pilots of all aircraft should visualize the location of the VORTEX trail behind large aircraft and use proper VORTEX avoidance procedures to achieve safe operation. It is equally important that pilots of large aircraft plan or adjust their flight paths to minimize VORTEX exposure to other aircraft.

Since the court has found that Franklin was not in the flow of fixed-wing aircraft at the time the pilot of the HH–3 helicopter crossed the threshhold for landing, the court also finds that the pilot of the HH–3 helicopter did not violate paragraph 544(d) of the AIM.

### Coast Guard Instruction 3100.1H

Plaintiffs next contend that defendants violated local Coast Guard Instruction 3100.1H (or a similar predecessor in effect at the time of the accident) which states that helicopters:

Shall fly a 1,000′ MSL right pattern whenever possible. This minimizes conflict with fixed-wing traffic who use an 800′ MSL left hand pattern . . .

Plaintiffs contend that the pilots of the HH–3 helicopter were negligent in not following this Coast Guard instruction on the day of the accident. Plaintiffs argue that if the pilots of the helicopter had been flying a 1,000′ MSL right traffic pattern, they could have discerned the Piper Turbo Arrow's intention to land.

The government concedes that it was possible for the HH–3 helicopter to use a right hand traffic pattern to land on the day of the accident, but argues that the pilots of the helicopter had discretion to use whatever pattern they felt appropriate under the circumstances. Captain David Ciacaglini, the Commander of the Coast Guard Air Station at Astoria, Oregon, at the time of the accident, testified that the words "whenever possible" meant "whenever necessary," and that a right hand pattern was used primarily for repetitive training maneuvers at the airport.

The court finds that Coast Guard Instruction 3100.1H is clear and unambiguous and that "whenever possible" and "whenever necessary" are not interchangeable. Captain Ciacaglini's explanation lacks credibility. Pursuant to Coast Guard Instruction 3100.1H, the HH–3 helicopter should have used a 1,000′ MSL right traffic pattern on the day of the accident.

Coast Guard Instruction 3100.1H is a *local* Coast Guard instruction, a violation of which is some evidence of negligence in that the pilot of the HH–3 helicopter failed to comply with his own internal directive. Negligence, however, without causation is not actionable. There is no evidence before the court that, even if the operators of the Coast Guard helicopter *had* used a right hand traffic pattern, the crash would not have occurred. Plaintiffs bear the burden of proving their case by a preponderance of the evidence. It would be sheer specula-

tion for the court to find that the crash would not have occurred if the operators of the Coast Guard helicopter had used the right hand traffic pattern rather than the left hand traffic pattern.

### Practice and Custom

■ Plaintiffs contend that it was the national custom and practice among helicopter pilots, other than Coast Guard helicopter pilots, to avoid flying in standard traffic patterns and to avoid landing on active runways at uncontrolled fields except in emergencies or during special training flights. Plaintiffs argue that the Coast Guard's decision on the day of the accident to fly in the standard traffic pattern and to land half-way down the active runway was contrary to the customary practices of the national aviation community.

In response to this argument, the government argues that the AIM in effect at the time of the accident required *all* aircraft including the HH–3 helicopter to use the standard traffic pattern. The government asserts that there are no special takeoff or landing procedures established for helicopters by the Port of Astoria which controls the Clatsop County airport. The Clatsop County airport operations manual in effect at the time of the accident required "aircraft"—presumably helicopters and fixed wing airplanes—to comply with the standard traffic pattern established for the airport unless authorized to do otherwise by the airport manager. The United States Army in its field manuals and air crew manuals applicable to helicopter pilots such as the one involved in this case, directs its helicopter pilots to fly the standard traffic pattern at uncontrolled airports.

The plaintiffs presented testimony from several experienced pilots stating that it was poor practice for the Coast Guard to have been in the standard traffic pattern at all and that it is the general practice among the aviation community for a helicopter to approach the active runway crossways to the runway and underneath the fixed wing pattern altitude.

The court is satisfied, however, that the testimony as to local practice and custom related mainly to small helicopters rather than the Coast Guard's HH–3 helicopters. The court finds that the procedures suggested by plaintiffs are not appropriate for large helicopters, would be contrary to the approach procedures recommended in the manufacturer's operating handbook for HH–3 helicopters, and would violate the landing procedures established by the Port of Astoria and the United States Army.

### Duty to Warn

■ Plaintiffs contend that the Coast Guard had a duty to minimize the potential hazard of the wake turbulence of the HH–3 helicopter by broadcasting a wake turbulence warning on UNICOM that the helicopter was intending to land. The court finds no evidence that such a warning was the custom and practice or was required by any rule or regulation. Furthermore, Franklin knew about the hazards of wake turbulence. He had extended his landing pattern and slowed his speed to avoid it.

In conclusion, the court finds that the negligence of Franklin in failing to avoid the wake turbulence of the Coast Guard HH–3 helicopter was the sole cause of the crash of the Turbo Piper Arrow and the death of Jon Dyer.

## ON MOTION TO RECOVER COSTS

■ The matters before the court are: (1) plaintiff's motion pursuant to Fed.R. Civ.P. 37(c) for an order allowing her to recover expenses reasonably incurred in proving that the subject aircraft crash was caused by wake turbulence and (2) plaintiff's objections to defendant's cost bill.

## MOTION TO RECOVER COSTS

On September 20, 1985, the court entered findings of fact and conclusions of law ruling that the defendant United States Coast Guard was not liable for injuries sustained by Jon Keith Dyer in the crash of the Piper Turbo Arrow which led to this litigation. Although the court ruled in fa-

vor of the defendant, the court found that the cause of the crash was wake turbulence.

Plaintiff requested that the defendant admit that wake turbulence was a substantial factor in the crash prior to trial pursuant to Fed.R.Civ.P. 36(a). Defendant would not do so. Plaintiff now contends that she is entitled to recover under Fed.R.Civ.P. 37(c) for expenses of proving that the cause of the crash was wake turbulence because this issue should never have been contested.

In support of her motion, plaintiff relies upon the evidence that was available to both parties prior to trial. Plaintiff cites the National Transportation Safety Board factual report that the airplane crashed after encountering "extreme turbulence" at the threshold of the runway; the Coast Guard's internal investigation which stated that the probable cause of the crash was the inability of the pilot to control the aircraft in turbulence; the eyewitness of the Coast Guard who testified in deposition that the crash he observed was caused by an encounter with wake turbulence. Plaintiff asserts that the government's refusal to admit this fact was without a reasonable basis and added needless and substantial expenses to the discovery process and the trial.

The government asserts that plaintiff's motion is not timely and that the government had reasonable grounds to believe that it might prevail on the issue of wake turbulence. The government explains that the opinion evidence contained in the reports relied upon by plaintiff was not admissible at trial. The government asserts that the time it takes for wake turbulence from a helicopter to dissipate is a difficult factual question, and its reliance upon the testimony of its expert witness was not in bad faith.

In reply, the plaintiff asserts that the fact that the government could obtain an expert to testify that wake turbulence was not the cause of the accident does not justify the failure to admit that wake turbulence caused the accident in light of its own factual reports and witnesses.

Federal Rule of Civil Procedure 36(a) provides that a party who considers that a matter requested for admission presents a genuine issue for trial and objects solely upon that ground does so subject to the provisions of Fed.R.Civ.P. 37(c), which provides:

(c) Expenses on Failure to Admit. If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit.

Plaintiff filed this motion ten days after the court issued its Findings of Fact and Conclusions of Law. The motion has been timely filed. However, the court agrees with the defendant's position that the issue of the time it takes for wake turbulence from a helicopter to dissipate is a difficult factual question. The court finds that the government had reasonable ground to believe that it might prevail on the matter. While some factual reports support the assertion that wake turbulence caused the crash, the scientific data provided by plaintiff in support of its assertion proved the issue by a preponderance of the evidence. Plaintiff's motion to recover costs under Fed.R.Civ.P. 37(c) is DENIED.

### OBJECTIONS TO COST BILL

The government filed a cost bill seeking costs of $16,732.04 including daily transcripts, witness fees, deposition costs, and

other costs. Plaintiffs object to any costs of daily transcripts in this case on the grounds that they were not required. The court finds that this case was not of the degree of complexity, length, or multiplicity of parties that ordinarily requires a daily transcript. The $1,217.50 claimed for daily transcripts is not allowed. The court finds the remainder of plaintiffs' objections without merit.

NOW, THEREFORE, IT IS HEREBY ORDERED that plaintiff's motion to recover costs under Fed.R.Civ.P. 37(c) is DENIED.

IT IS FURTHER ORDERED that the government is awarded $15,514.54 in costs.