Gladys **DYER**, Personal Representative of the Estate of Jon Keith Dyer, Deceased; **Central National Insurance Company of Omaha, Nebraska, a foreign corporation, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 85–4369.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1987.

Decided Oct. 7, 1987.

As Amended Nov. 25, 1987.

---

Jonathan M. Hoffman, Portland, Or., and Nelson L. Walker, Oregon City, Or., for plaintiffs-appellants.

Richard R. Stone, Sr., Washington, D.C., for defendant-appellee.

Before GOODWIN and THOMPSON, Circuit Judges, and CURTIS,* District Judge.

GOODWIN, Circuit Judge:

Appellants sued under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1982), for a death resulting when the small airplane in which the decedent was a passenger crashed while landing shortly after a large Coast Guard helicopter landed on the same runway. In a nonjury trial, the district court found that the crash was the result of wake turbulence from the helicopter's landing minutes before, and that the cause of the accident was the negligence of the aircraft pilot when he misjudged the precautions necessary to avoid the turbulence. The court found no negligence in the operation of the Coast Guard helicopter, 633 F.Supp. 750. We affirm.

Jon Keith Dyer, 28, was killed on March 14, 1981, when the Piper Turbo Arrow air-craft in which he was a passenger crashed at the Clatsop County Airport in Astoria, Oregon. The pilot, John R. Franklin, was a properly certified pilot, even though he was relatively inexperienced with approximately 300 hours of flight time.

At about the same time that the Piper Turbo Arrow was approaching the airport, a large HH–3 Coast Guard helicopter weighing 17,800 pounds was also approaching the airport. The Clatsop County Airport is used both by general aviation aircraft and large military aircraft, such as the helicopter involved here. Because there is no control tower, the aircraft operate under visual flight rules and follow their own sequencing and separation. It is customary, although not required, in such uncontrolled locations for pilots to use a common radio frequency called UNICOM to make their flight intentions known to other pilots.

The co-pilot of the Coast Guard helicopter testified that he noticed a plane like the Piper Turbo Arrow to the west of the airport as the helicopter approached for landing. He testified that it did not appear to him that the plane was preparing to land because of its distance and direction heading away from the airport. He also testified that he heard no transmissions on UNICOM to indicate that the plane was intending to land.

Franklin, the airplane pilot, testified that he first saw the helicopter as the helicopter was approaching the end of the runway. Franklin testified that he purposely slowed down and extended his approach before turning toward the runway in order to avoid the helicopter's wake turbulence. Franklin communicated with the Portland Flight Service Station on a radio frequency other than UNICOM.

The helicopter completed its left-hand approach crossing the threshold of the operative runway at approximately 55 knots, 350 feet above ground level. The helicopter steadily reduced its airspeed and altitude

---

* Honorable Jesse W. Curtis, Senior United States District Judge, Central District of California, sitting by designation.

and landed at the midpoint of the runway with virtually no forward speed. This maneuver is known as a "no hover" landing.

Approximately two minutes later, the Piper Turbo Arrow crashed while attempting to land on the same runway. Dyer was killed in the crash and the aircraft was damaged beyond repair. The appellants in this action are the decedent's mother, Gladys Dyer, and the Central National Insurance Company of Omaha, Nebraska, the insurer of the plane.

## I. Negligence Per Se Claim

Appellants' first contention is that the trial court wrongly interpreted 14 C.F.R. § 91.89 (1987)[1] in holding that operation of the Coast Guard helicopter did not constitute negligence per se.

■ Negligence per se liability is founded upon violation of a statute or safety regulation, which raises a rebuttable presumption of negligence if the violation results in injury to a member of the class of persons intended to be protected by the legislation, and the harm is the kind the regulation was intended to prevent. *Brennen v. City of Eugene*, 285 Or. 401, 412 n. 5, 591 P.2d 719, 725 n. 5 (1979).

### A. *Interpretation of "Flow" Under 14 C.F.R. § 91.89(a)(2)*

■ On the day of the accident, both the airplane and the Coast Guard helicopter used a left-hand landing approach, meaning they both made all turns to the left toward the final approach over the runway. The first subsection of the regulation, 14 C.F.R. § 91.89(a)(1), requires that all airplanes use a left-hand landing approach at uncontrolled airports, unless the airport signals prescribe a right-hand approach, which was not the case here. The second subsection provides that all helicopters must "avoid the flow of fixed-wing aircraft." § 91.-89(a)(2).

The appellants claim that the trial court wrongly interpreted the word "flow" in § 91.89(a)(2) in finding that the Coast Guard did not violate the regulation. The regulation is part of pilots' "rules of the road" promulgated by the Federal Aviation Administration (FAA). *In re N–500L Cases*, 691 F.2d 15, 28 (1st Cir.1982). The question is troublesome because "flow" is not specifically defined in the Federal Aviation Regulations, and we know of no court or administrative agency decisions interpreting the meaning of "flow" as used in 14 C.F.R. § 91.89.

The trial court found that the airplane was not in the "flow" of fixed-wing aircraft at the time the helicopter crossed the threshold of the runway. *Dyer v. United States*, 633 F.Supp. 750, 757 (D.Or.1985). The trial court apparently agreed with the government that the term "flow" in 14 C.F.R. § 91.89(a)(2) connoted that traffic must be already present, and that because there was no traffic present in a landing pattern (*i.e.*, no "flow") when the helicopter crossed the runway threshold for landing, that the helicopter's use of a left-hand approach did not violate 14 C.F.R. § 91.-89(a)(2). *Id.* at 756–57.

Appellants counter that it was negligence per se for the Coast Guard helicopter to use the left-hand landing pattern and the operative runway because the "flow" of fixed-wing aircraft should be deemed synonymous with the traffic pattern for airplane landings. Although "flow" is not defined in the regulations, appellants argue that "flow" should be defined by reference to its use in the definition of "traffic pattern." *See* 14 C.F.R. § 1.1 (" '[t]raffic pat-

---

**1.** 14 C.F.R. § 91.89, which was not amended between the date of the accident in 1981 and the date of our decision in 1987, provides:

(a) Each person operating an aircraft to or from an airport without an operating control tower shall—

(1) In the case of an airplane approaching to land, make all turns of that airplane to the left unless the airport displays approved light signals or visual markings indicating that turns should be made to the right, in which case the pilot shall make all turns to the right;

(2) *In the case of a helicopter approaching to land, avoid the flow of fixed-wing aircraft;* and

(3) In the case of an aircraft departing the airport, comply with any FAA traffic pattern for that airport.

(Emphasis added.)

tern' means the traffic *flow* that is prescribed for aircraft landing at, taxiing on, or taking off from, an airport" (emphasis added)). As a result, appellants argue, the proper interpretation of the regulation requires that helicopters avoid the standard traffic pattern for fixed-wing aircraft at all times, whether or not there are airplanes present in the traffic pattern.

■ The language of a regulation or statute is the starting point for its interpretation. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The plain meaning governs unless a clearly expressed legislative intent is to the contrary, *id.*, or unless such plain meaning would lead to absurd results. *Bechtel Const., Inc. v. United Bhd. of Carpenters*, 812 F.2d 1220, 1225 (9th Cir.1987).

We are persuaded that the trial court correctly interpreted the plain language of the regulation to indicate that "flow" connotes existing traffic. The definition of "traffic pattern" as the "traffic *flow* prescribed for aircraft landing at ... an airport," (14 C.F.R. § 1.1 (emphasis added)), does not necessarily mean that "flow" can only mean "traffic pattern" whenever it is used in the regulation.

Webster's Third New International Dictionary of the English Language Unabridged (1981) defines "flow" as "an easy smooth and uninterrupted progress or movement ... suggesting the steady flow of water in a river." The "flow" of air traffic in § 91.89(a)(2) is analogous to the flow of a river; there is no "flow" unless water is present. An empty channel may show evidence of where the river "flows" when it is present, but in common usage one would not call such a streamed a "flow" absent at least a trickle of water in the channel. A flow of automobile traffic on a freeway offers a similar analogy. There is no "flow" of traffic when there are no cars, even though the empty freeway demonstrates the "traffic pattern" where the traffic would "flow" if traffic were present.

Appellants' view of "flow" in § 91.-89(a)(2) would also be inconsistent with the

regulation's third subsection: "In the case of an aircraft departing the airport, [each aircraft operator shall] comply with any FAA traffic pattern for that airport." 14 C.F.R. § 91.89(a)(3). The government convincingly argues that to read "flow" as synonymous with "traffic pattern" would result in the anomalous interpretation requiring helicopters to use the standard traffic pattern for all takeoffs, but prohibiting them from using the same pattern for landings.

Additionally, the legislative history and administrative cases applying the regulation indicate that § 91.89 was promulgated to avoid collisions, not wake turbulence. Federal Aviation Administration aviation safety inspector Joe Redwine testified that the effects of wake turbulence were not yet known in 1961, when the precursor to the present 14 C.F.R. § 91.89 was put into effect. The first known helicopter wake turbulence tests were conducted in 1962 by the National Aeronautics and Space Administration. *Franklin v. United States*, 342 F.2d 581, 585 (7th Cir.), *cert. denied*, 382 U.S. 844, 86 S.Ct. 51, 15 L.Ed.2d 84 (1965). The administrative cases interpreting the regulation—although none deal with the second subsection relating to helicopters—indicate that the statute was promulgated to require predictable traffic patterns for collision avoidance at uncontrolled airports. *See Engen v. Dunahee*, No. EA–2537, slip op. (N.T.S.B. May 21, 1987) (finding safety was compromised when pilot violated § 91.-89 by flying pattern contrary to airport rule, causing another pilot to execute evasive maneuvers to prevent collision); *In re Cairns*, 3 N.T.S.B. 2897, 2898 (1980) (same); *In re Von Pichl*, 2 N.T.S.B. 1173, 1174, 1177 (1974) (same).

A local Coast Guard instruction recommends that helicopters fly a right-hand pattern whenever possible to prevent conflict with fixed-wing aircraft which use a left-hand pattern. *See* Coast Guard Air Station Astoria Instruction 3100.1H. Appellants argue that this instruction was evidence of the Coast Guard's attempt to implement § 91.89(a)(2) and evidence that the Coast Guard understood "flow" to be synon-

ymous with "traffic pattern." Considering the other indicia concerning the regulation's meaning, we are not convinced that local Coast Guard instruction 3100.1H is dispositive. We do not find any evidence that the FAA intended the regulation to mean that helicopters could never use the standard traffic pattern and active runway whether or not other traffic is present at an airport.

Appellants conceded at oral argument, moreover, that "avoiding the flow" of fixed-wing aircraft does not simply mean that the FAA intended that all helicopters should use right-hand traffic patterns for landing. Appellants agreed that the trial court was correct in determining that using a right-hand landing approach would not have prevented the accident because the same runway would have been used, causing the same wake turbulence that resulted in the instant crash.

Appellants' counsel stated at oral argument that the final landing approach and the runway are elements of the total "traffic pattern," and that therefore "avoiding the flow" means avoiding the final approach and the active runway expected to be used by planes. Hence, appellants' claim that "flow" is synonymous with "traffic pattern" would lead to the result that a helicopter could never use a runway at an uncontrolled airport. Appellants' counsel supported this theory at oral argument by contending that commercial helicopter pilots typically refrain from landing on runways because of the safety hazard posed by such landings and because helicopters have superior maneuverability and do not need to land on runways.

Appellants, however, failed to substantiate that contention with supporting citations to the relevant authority. They avoid argument on this specific point in their briefs. Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that arguments be supported with references to authorities and parts of the record relied upon. Appellants apparently argued the issue in the trial court, but the court found that testimony as to local practice and custom of commercial helicopter operators re-

fraining from landing on runways related mainly to small helicopters, rather than to large helicopters such as the Coast Guard's HH-3 helicopter involved here. *Dyer*, 633 F.Supp. at 758.

After reviewing the various flight manuals, exhibits, and expert testimony in the transcripts, as well as the language of the regulation itself, we cannot accept appellants' view that the FAA intended such a sweeping prohibition in 14 C.F.R. § 91.-89(a)(2). FAA aviation safety inspector Redwine testified that nothing in the Federal Aviation Regulations demands that helicopters land at a place other than the runway, nor does any regulation demand a landing approach different from the one the Coast Guard used preceding the accident. The appellants' own helicopter pilot expert, Gerry Curtis, testified that he had flown large helicopters over final approaches to the active runway for planes at various uncontrolled airports in Oregon and Washington. Robert D. Thompson, a civilian flight instructor with the U.S. Army, testified that the Army does not teach its pilots to avoid landing on runways. Thompson also testified that the Army teaches its pilots that landing helicopters on a runway provides optimum safety. The Army's helicopter field manual and the local Coast Guard instruction both refer to helicopter runway landings. *See* "Rotary Wing Flight" Army Field Manual No. 1-51 at 3-9 (Apr. 16, 1979); Coast Guard Air Station Astoria Instruction 3100.1H.

For the above-stated reasons, we find that the trial court did not err in interpreting 14 C.F.R. § 91.89(a)(2).

**B.** *Foreseeability and negligence per se*

■ Foreseeability is not an element of a negligence per se cause of action under Oregon law. *Oksenholt v. Lederle Laboratories*, 294 Or. 213, 219, 656 P.2d 293, 297 (1982); *Brennen*, 285 Or. at 412 n. 5, 591 P.2d at 725 n. 5. Appellants argue that the trial court used an erroneous legal standard by impermissibly grafting a foreseeability element onto the negligence per se

claim under 14 C.F.R. § 91.89(a)(2). *See Dyer*, 633 F.Supp. at 757.

Even if we were to agree that the trial judge erroneously engrafted a foreseeability element onto a negligence per se cause of action, we would still have to affirm the ultimate decision that appellants failed to prove a violation of the regulation. We may affirm a district court decision on any ground finding support in the record. *Smith v. Block*, 784 F.2d 993, 996 n. 4 (9th Cir.1986).

## II. Common Law Negligence Claim

This court must review de novo the question whether the trial court applied the proper standard of care or duty when it found that the Coast Guard was not negligent. *Miller v. United States*, 587 F.2d 991, 994–95 (9th Cir.1978). The application of the legal standard to the facts is reviewed under the clearly erroneous standard. *Id.*

"[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff" *Fazzolari v. Portland School Dist.*, 303 Or. 1, 734 P.2d 1326, 1336 (1987).

It is not necessary that the exact manner of harm be foreseen. *Ollison v. Weinberg Racing Ass'n*, 69 Or.App. 653, 661, 688 P.2d 847, 851 (1984). Rather, the issue is whether the harm is of the general kind to be anticipated from the conduct and whether the person harmed is one of the general class threatened. *Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 608, 469 P.2d 783, 786 (1970).[2] The Oregon courts look to whether the conduct was a substantial factor in causing the crash, rather than

using a proximate cause analysis. *Id.* at 606, 469 P.2d at 784–85. If we were to find the Coast Guard liable, then we would have to reverse the judgment and remand for determination of the Coast Guard's share of fault and damages under Oregon's comparative negligence law, Or.Rev.Stat. § 18.-470 (1985).

Both airplanes and helicopters generate a wake in flight. FAA Advisory Circular 90–23D, at 2, 15 (Dec. 15, 1972). The pressure differential that generates lift for these aircraft triggers an airflow behind the airplane wing or helicopter rotor that results in counter-rotating vortices, *id.* at 2, resembling "horizontal tornadoes." *Neal v. United States*, 562 F.2d 338, 342 (5th Cir.1977) (Hill, J., dissenting). The greatest vortex strength occurs when the generating aircraft—like the helicopter here—is heavy and slow. FAA Advisory Circular 90–230 at 3. As was also the case here, a following aircraft with a short wing span relative to the propeller size or wing span of the generating aircraft has the most difficulty in counteracting turbulence from large aircraft. *Id.* at 4. These vortices are difficult to avoid because they are invisible, in the absence of some kind of smoke or haze in the vicinity.

To avoid wake turbulence, pilots must visualize the location of the vortex trail behind and below large aircraft and stay clear by flying above the wake. This means landing beyond the touchdown point of the generating aircraft. *Id.* at 8–11.

In the instant case, Franklin landed behind the helicopter's touchdown point, not beyond it. Although he allowed about two minutes to pass before landing, the trial court accepted plaintiffs-appellants' testimony that two minutes was within the hazardous period for a small airplane to land following the landing of the large Coast Guard helicopter. In reaching its

---

**2.** Appellants argue that the trial court impermissibly found that the Coast Guard owed no duty to minimize the hazards of its wake turbulence because of unforeseeability as to the particular plane piloted by Franklin. They argue that all that is required is that the plaintiff be one of a general class threatened. *Jefferson Plywood,*

255 Or. at 608, 469 P.2d at 786. Even if the trial court misapplied Oregon's foreseeability standard, however, we would still affirm the trial court's finding of no Coast Guard liability if such a finding is supported by the record. *Smith v. Block*, 784 F.2d at 996 n. 4.

conclusion, the court noted that it is difficult, if not impossible, to determine accurately the amount of time it takes for wake turbulence to dissipate, because of the various factors of weather and wind conditions, and the speed and size of the respective aircraft. *Dyer,* 633 F.Supp. at 754–55. The court's finding that wake turbulence caused the crash was not clearly erroneous.

Appellants wrongly contend that the trial court's finding that wake turbulence caused the crash is inconsistent with the finding that Franklin was solely negligent in failing in his duty to avoid the wake turbulence. *Dyer,* 633 F.Supp. at 755, 757–58. Appellants must demonstrate that defendant's negligence—not merely its actions—was a substantial factor in causing the crash. We analyze this question by examining whether defendant's "conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari,* 734 P.2d at 1336.

Although we apply Oregon negligence law to this claim, we seek guidance on the standard of care from the Federal Aviation Regulations and from general aviation law. *See In re N–500L Cases,* 691 F.2d at 27–28; *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1180–81 (5th Cir.1975).

FAA aviation safety inspector Redwine testified that wake turbulence is not specifically addressed in any part of chapter 91 of 14 C.F.R. of the Federal Aviation Regulations. He said that 14 C.F.R. § 91.9, proscribing careless or reckless aircraft operation, might encompass any duties related to wake turbulence. Another court has found the duty to avoid wake turbulence within 14 C.F.R. § 91.65(a) (dealing with collision hazards) and § 91.67(a) (governing right-of-way procedures). *See N–500L Cases,* 517 F.Supp. 825, 833 (D.P.R.1981), *aff'd,* 691 F.2d 15 (1st Cir.1982).

In addition to these general safety regulations, the FAA publishes information regarding wake turbulence in its Airman's Information Manual and in the FAA advisory circulars. Pilots are bound by 14 C.F.R. § 61.105(a) to be familiar with the information contained in these publications and in the Federal Aviation Regulations. These rules, information manuals and circulars constitute evidence of the standard of care among all pilots. *Muncie Aviation,* 519 F.2d at 1180–81; *N–500L Cases,* 517 F.Supp. at 833.

Relevant provisions of the Airman's Information Manual in effect at the time of the accident provide:

> Pilots of all aircraft should visualize the location of the vortex trail behind large aircraft and use proper vortex avoidance procedures to achieve safe operation. It is equally important that pilots of large aircraft plan or adjust their flight paths to minimize vortex exposure to other aircraft.

Airman's Information Manual para. 544(d) (Jan. 1981).

> Government and industry groups are making concerted efforts to minimize or eliminate the hazards of trailing vortices. However, *the flight disciplines necessary to assure vortex avoidance during VFR operations must be exercised by the pilot.* Vortex visualization and avoidance procedures should be exercised *by the pilot* using the same degree of concern as in collision avoidance.

*Id.* at para. 551(a) (emphasis added).

In addition to the above-cited passages, the FAA Advisory Circular 90–23D, in particular, contains pages of text and illustrations explaining what wake turbulence is, how and where it is formed, and how to avoid it. The advisory circular includes specific information and numerous warnings regarding the particular danger presented when a small aircraft encounters the wake of a large aircraft.

■ The ultimate responsibility for the safe operation of aircraft under visual flight rules rests with the pilot, regardless of air traffic clearance. *Hamilton v. United States,* 497 F.2d 370, 374 (9th Cir.1974); *United States v. Miller,* 303 F.2d 703, 710 (9th Cir.1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). Flight under visual flight rules, as compared to instrument flight rules, is guided by the

overriding principle: "see and be seen" or "see and avoid." *Hamilton,* 497 F.2d at 372.

■ Even at controlled airports where air traffic controllers help direct pilots, the primary and ultimate responsibility for safe aircraft operation under visual flight rules, including wake turbulence avoidance, rests with the pilot. *Miller v. United States,* 587 F.2d 991, 995–96 (9th Cir.1978); *see also Kack v. United States,* 570 F.2d 754, 755–56 (8th Cir.1978) (controller had no special duty to warn pilot of his precariously low altitude because pilot, even though a student, had primary responsibility to avoid wake turbulence); *Jenrette v. United States,* 14 Avi. 17,798, 17,801 (N.D.Cal. 1977) (absent indication to the contrary, air traffic controller had no duty to warn of wake turbulence because he had a right to expect that pilot was trained to avoid turbulence by flying above flight path of preceding aircraft and by landing at a point beyond the touchdown point of the preceding aircraft). The responsibility for avoiding wake turbulence is placed on the pilot under visual flight rules because the pilot is in the best position to visualize the location of the vortex trail behind large aircraft and to do whatever is necessary to avoid the hazard. *N–500L Cases,* 517 F.Supp. at 833.

It is undisputed that Franklin had a duty to be, and actually was, familiar with information regarding wake turbulence avoidance published in the Airman's Information Manual and in the FAA advisory circulars. *See* 14 C.F.R. § 61.105(a). He prolonged his approach in an attempt to avoid the wake left by the helicopter, but tragically, those measures were insufficient to prevent the accident.

We conclude that the primary duty was on Franklin to understand and safely avoid the hazards left by the helicopter's wake. He breached this duty by following too closely on the heels of the helicopter landing, in a position behind the helicopter's touchdown point on the runway, which placed him in an area endangered by the existing turbulence on the runway. Judging how long wake turbulence takes to

dissipate is difficult, but the primary responsibility for such avoidance is on the pilot—not on an aircraft that landed safely on a runway after it clearly had the right-of-way to land. *See* 14 C.F.R. § 91.67(f) ("Aircraft, while on final approach to land, or while landing, have the right of way over other aircraft").

Appellants have mentioned no Coast Guard standard of conduct defining the defendant's duty that constituted a substantial factor in causing the crash. For the reasons stated in the negligence per se analysis, *supra,* the Coast Guard helicopter crew had no duty—under 14 C.F.R. § 91.89 or otherwise—to use anything other than the standard left-hand landing pattern prescribed by the Clatsop County Airport. For the reasons also stated in the previous section, the Coast Guard was under no duty to refrain from landing on the operative runway. We agree with the trial court that there is no evidence in the record nor cited authorities indicating that the helicopter crew had a duty to broadcast a wake turbulence warning. *Cf. Miller,* 587 F.2d at 995–96; *Kack,* 570 F.2d at 755–757; *Jenrette,* 14 Avi. at 17,800. Nor have appellants cited authority leading us to conclude that the Coast Guard had a duty to monitor all radio frequencies when the crew became aware that a small plane was in the vicinity.

We are not persuaded by appellants' reliance on three cases to support their contention that the Coast Guard breached its duty to minimize its wake turbulence. This is not a case where the Coast Guard helicopter is partly at fault for failing to minimize its wake turbulence when overtaking another airplane. *See N–500L Cases,* 691 F.2d at 25–27. The second case, *Wenninger v. United States,* 234 F.Supp. 499 (D.Del.1964), *aff'd,* 352 F.2d 523 (3rd Cir. 1965), actually supports the government's position. The *Wenninger* court found evidence insufficient to prove that a wake turbulence warning would have prevented the accident, especially noting that the ultimate responsibility for such avoidance was on the pilot. *Id.* at 514–17. Likewise in the instant case, the primary responsibility

was on the pilot, Franklin, and the evidence in the record seems similarly insufficient to prove that a warning from the Coast Guard would have prevented this accident. Nor does *Franklin*, 342 F.2d at 584–85, aid appellants' position because the *Franklin* court found that the air traffic controller was not negligent in failing to warn of wake turbulence dangers.

 The airplane pilot was chargeable with knowing the dangers of wake turbulence and had the ultimate responsibility of avoiding the turbulence that he knew was present on the runway. He breached that duty by landing behind the helicopter's touchdown point on the runway and before the hazardous conditions from the wake turbulence had passed. The trial court could find that the Coast Guard's conduct did not unreasonably create a foreseeable risk to the plaintiff. The trial court accordingly did not err in finding that Franklin's breach was the sole substantial factor causing the crash that resulted in Dyer's death.

Affirmed.