RIVERSIDE CEMENT COMPANY, et al., Petitioners,

v.

Lee M. THOMAS, Administrator, United States Environmental Protection Agency, Respondents.

Nos. 86–7126, 86–7132.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1988.

Decided April 8, 1988.

As Amended June 21, 1988.

Charlotte Uram, Landels, Ripley & Diamond, San Francisco, Cal., and James E. Good, Gresham, Varner, Savage, Nolan & Tilden, San Bernardino, Cal., for petitioners.

David W. Zugschwerdt, Dept. of Justice, Washington, D.C., for respondents.

Before NOONAN and THOMPSON, Circuit Judges, and TEVRIZIAN,[*] District Judge.

NOONAN, Circuit Judge:

At the heart of this case is a federal agency's acceptance of the bureaucratic equivalent of an illusory contract. What happened was this: The South Coast Air Quality Management District on January 8, 1982 adopted a rule regulating the permissible emission of nitrogen oxide from cement kilns. Rule 1112 stated in subsection (b)(1) that the discharge from a kiln could be "no more than 3.1 lbs. of nitrogen oxides per ton of clinker produced"; the rule went on to say in section (d) that prior to the Rule's effective date a hearing was to be held to review this limit and that if it was determined that the emission limit was "not supported by the evidence presented at the public hearing" then the emission limit should "be modified to the extent supported by the evidence."

The California Air Resources Board submitted Rule 1112 to the Environmental Protection Agency (EPA) as a revision of the State of California's plan for achieving what are called "national ambient air quality standards," that is, the standards set by EPA for outdoor air breathed by the public. On March 23, 1983 EPA issued a notice of proposed rulemaking apropos approval of this rule pursuant to its authority under the Clean Air Act, 42 U.S.C. § 7410(a),(c); 48 Fed.Reg. 12108-09. The notice stated that "Rule 1112 is contingent upon the results of ongoing fact finding." No further action was taken at this time.

On January 8, 1984 the South Coast Air Quality Management District extended until January 1986 the date for the public hearing on feasibility. The California Air Resources Board approved this extension and submitted it to EPA. On October 24, 1984 EPA again gave notice of rulemaking in relation to Rule 1112. This notice stated the limit of 3.1 pounds in absolute terms without reference to the condition in the rule itself. On January 7, 1986 EPA, without waiting for the feasibility hearing, approved the rule effective February 6, 1986. 49 Fed.Reg. 42748. Supplementary information published by EPA indicated that EPA regarded the rule as now setting an absolute limit of 3.1 pounds without regard to the contingency built into the rule. The petitioner cement companies challenge EPA's interpretation of the rule as arbitrary. 42 U.S.C. § 7607(d)(9).

EPA has been delegated authority by Congress to interpret the statutory scheme that the Clean Air Act has entrusted to its administration. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845-46, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). Its regulations are controlling unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. EPA here has acted arbitrarily, capriciously and contrary to the statute.

Congress set up a structure in which the states have the initiative. EPA's role in enforcing "the specific, source-by-source emission limitations" is "secondary." *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 79, 95 S.Ct.

---

[*] Honorable Dickran M. Tevrizian, Jr., United States District Judge for the Central District of California, sitting by designation.

1470, 1481, 43 L.Ed.2d 731 (1975). EPA may either accept or reject what the state proposes; but EPA may not take a portion of what the state proposes and amend the proposal ad libitum. Rule 1112 was proposed by the California authorities with a proviso that prevented it from having any effect prior to a public hearing on feasibility. This proviso was distinct from the general requirement of the statute that all state plans provide for revision. 42 U.S.C. § 7410(a)(2), (4). The proviso introduced a doubt into the standard itself. EPA could not without arbitrariness and caprice strike the proviso and pretend that it has a rule with an absolute limit. EPA could not, without following the procedure set by the statute, 42 U.S.C. § 7410(c), take upon itself the primary role Congress assigned to the states.

■ There was a further unlawful element in EPA's action. While it purported to establish an emission limitation which would achieve a certain reduction in nitrogen oxides emissions from cement kilns, in fact Rule 1112 is an elusive and illusory measure. EPA could not approve that rule as satisfying Clean Air Act § 110(a)(2)(B)'s requirement that a SIP include "emission limitations ... as may be necessary to insure attainment and maintenance of such primary or secondary standard ...." 42 U.S.C. § 7410(a)(2)(B). We accordingly vacate EPA's approval of Rule 1112 and remand for proceedings consistent with this Opinion.

VACATED AND REMANDED.

DAVID R. THOMPSON, Circuit Judge, dissenting:

I respectfully dissent.

Pursuant to the Clean Air Act, 42 U.S.C. § 7401 et seq., EPA promulgates National Ambiant Air Quality Standards (NAAQSs) and the states must devise plans to implement and enforce these standards (State Implementation Plans or SIPs). Following notice, hearings, and adoption of the SIP, or SIP revision, the state submits the SIP or SIP revision to EPA for approval. 42 U.S.C. § 7410(a)(2). If the SIP satisfies the statutory criteria, EPA must approve it "or any portion thereof"; otherwise, EPA must promulgate a substitute plan that complies with the law. 42 U.S.C. § 7410(c).

In 1977 the Clean Air Act was amended to require EPA to designate those areas not meeting the NAAQSs as "nonattainment areas." The states involved were required to revise their SIPs for such areas to adopt more stringent air pollution controls. 42 U.S.C. § 7502. In 1978, the South Coast Air Basin (Riverside, San Bernardino, Orange and Los Angeles Counties) was designated a nonattainment area for nitrogen oxide (NOx). 40 C.F.R. § 81.305 (1987). As a result, the California Air Resources Board (CARB) and the South Coast Air Quality Management District (SCAQMD) began in 1980 to consider ways of regulating nitrogen oxide emissions from, among other sources, cement kilns in the South Coast Air Basin.[1]

In September, 1981, after receiving input from the public, industry and EPA, CARB published a report entitled "Suggested Control Measure for the Control of Emissions of Oxides of Nitrogen from Cement Kilns." This report stated that cement kilns "are a significant source of NOx emissions." It proposed measures to achieve a 38% reduction in cement kiln NOx emissions which included a requirement that existing kilns emit a maximum of 3.1 pounds of NOx per ton of cement clinker produced. According to the report, the 3.1 lb/T limit was technologically feasible and cost effective.

On January 8, 1982, the SCAQMD voted to adopt the CARB proposal as Rule 1112. As part of its resolution adopting Rule 1112, the District stated that "considering the technological and economic circumstances of the sources, [the 3.1 lb/T limit] is a reasonably available control measure." As adopted, Rule 1112 established an emission limit of 3.1 lbs/T, a compliance date of July 1, 1984, and a provision for review and possible adjustment of the emission limit in January, 1984, prior to the final compliance

---

1. Petitioners Riverside Cement Company and California Portland Cement Company each own two of the four cement kilns in the South Coast Air Basin.

date. This review provision was designated paragraph (d) of Rule 1112. It reads as follows:

*Effective Date*

The operator of any cement manufacturing facility, subject to this rule, shall comply with the provisions of this rule on or before July 1, 1984. The Executive Officer shall, within 30 days after January 1, 1984, conduct a public hearing to review the emission limit of 3.1 pounds of NOx per ton of clinker produced. If the Executive Officer determines that the emission limit is not supported by the evidence presented at the public hearing, the compliance date and/or the emission limit shall be modified to the extent supported by the evidence.

In March, 1982, CARB adopted the SCAQMD's Rule 1112 and submitted it to EPA as a SIP revision despite petitioner Riverside's petition to CARB to delay submission of Rule 1112 until after the January 1984 hearing. In November, 1982, industry representatives requested EPA to postpone approving the Rule, or to disapprove it. EPA then contacted both the CARB and the SCAQMD to determine whether they wished EPA to postpone action. Both state agencies requested EPA to approve Rule 1112 without delay. EPA then proposed approval of Rule 1112. Due to delays in data collection as a result of reduced cement production, on January 6, 1984, the SCAQMD amended Rule 1112 to postpone the compliance date until July, 1986, and to postpone the review hearing until January, 1986. In April, 1984, again despite industry protests, CARB submitted amended Rule 1112 to EPA. EPA proposed approval in October, 1984 and submitted its Notice of Final Rulemaking on December 11, 1985.

On January 24, 1986 the state held a public hearing. As a result of that hearing, the state adopted an emission limit of 6.4 lb/T, averaged monthly, and 11.6 lb/T averaged daily. CARB has now submitted

to EPA a proposed revision to Rule 1112's emission limit, but it has not endorsed the cement companies' claim that the original 3.1 lb/T limit was not intended to be enforceable.

What we have in this case is a difference in interpretation of the state's Rule 1112 which the EPA approved. The cement companies argue that because this Rule provided for a future public hearing to review the emission limit of 3.1 lb/T (the hearing held January 24, 1986), and because paragraph (d) of the Rule provided for a modification of the emission limit if the state determined that the 3.1 limit was not supported by evidence presented at the hearing, the initial 3.1 limit was not a requirement of the plan at all, but merely a "target limit." And EPA's attempted enforcement of the 3.1 emission limit is an impermissible revision of the plan made without following the rulemaking provisions of the Clean Air Act.

EPA contends, on the other hand, that the 3.1 limit was not contingent upon confirmation of this emission standard at the January 1986 public meeting. The 3.1 limit was included in the plan which the state submitted and which EPA approved; any proposed changes as a result of the January 1986 meeting would have to be submitted as a SIP revision to EPA for approval.[2]

Under the Administrative Procedure Act, we review agency action to determine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (quoting the Administrative Procedure Act, 5 U.S.C. § 706). Although the reviewing court must engage in a "substantial inquiry," i.e., "a thorough, probing, in-depth review," *id.* at 415, 91 S.Ct. at 823, it is a narrow standard of review in which the court should not substitute its judgment for that of the agency. *Motor Ve-*

**2.** In fact, the state has submitted a revision to Rule 1112 which is presently under considera-
tion by EPA.

*hicle Mfrs. Ass'n, Inc. v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

In the instant case, CARB submitted Rule 1112 to EPA as a SIP revision. The state agencies involved (SCAQMD and CARB) conducted extensive research on, and were well aware of, the emission limits contained in Rule 1112, yet decided to submit the Rule to EPA for approval prior to the hearing date specified in paragraph (d). There is no indication in the record that the original 3.1 limit was not intended to be enforceable. EPA did not, as the majority suggests, "amend the [state's] proposal ad libitum." EPA approved the Rule as submitted, subject to a possible later revision. Rule 1112 is a state rule. EPA interpreted it, and approved it, in accordance with the approval and revision requirements of the Clean Air Act, the statute EPA is entrusted to administer. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed. 2d 694 (1984). EPA's interpretation is reasonable. And it is entitled to deference. *Id.*

The majority states that Rule 1112 contained a proviso preventing the Rule from having any effect prior to a public hearing on feasibility. This is the cement companies' interpretation, and it is not supported by the evidence. On the contrary, both the language of the Rule and the conduct of the state authorities support EPA's interpretation of the Rule. Nowhere in Rule 1112 do the words "target" or "goal" appear. Rather, a specific limit is set. Why insert a specific limit in the plan unless it is to have some meaning? If it is really only a "target" why doesn't the plan say so?

By choosing to adopt the cement companies' interpretation over the EPA's, the majority is substituting its judgment for that of the administrative agency charged with administering the Clean Air Act. Moreover, whether or not the 3.1 lb/T limit was "feasible" is not relevant to our determina-

tion of whether the EPA impermissibly approved the Rule. "[C]laims of economic and technological infeasibility [are] wholly foreign to the Administrator's consideration of a state implementation plan." *Union Electric Co. v. EPA,* 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976).

In my view the agency's interpretation is reasonable and its action should be affirmed. *See Kamp v. Hernandez,* 752 F.2d 1444, 1450 (9th Cir.1985).