**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAFE AIR FOR EVERYONE; AMERICAN
LUNG ASSOCIATION OF IDAHO; NOËL
STURGEON,
                      *Petitioners,*

              v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; STEPHEN L.
JOHNSON, Administrator of the
United States Environmental
Protection Agency; ELIN D.
MILLER,* Regional Administrator
of the United States
Environmental Protection Agency,
Region X,
                      *Respondents,*

STATE OF IDAHO,
                      *Intervenor.*

No. 05-75269

EPA No.
ID-03-003

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
November 15, 2006—Seattle, Washington

Filed January 30, 2007
Amended May 29, 2007

*Elin D. Miller is substituted for her predecessor as Regional Administrator of the United States Environmental Protection Agency. Fed. R. App. P. 43(c)(2).

6265

Before: Arthur L. Alarcón, Pamela Ann Rymer, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

David S. Baron, Earthjustice, Washington, D.C., for the petitioners.

Paul Cirino, Environmental Defense Section, U.S. Department of Justice, Washington, D.C., for the respondents.

Lisa J. Kronberg, Deputy Attorney General, Idaho Department of Environmental Quality, Boise, Idaho, for the intervenor.

## ORDER

Petitioners' Petition for Clarification is GRANTED. The opinion filed on January 30, 2007 and reported at 475 F.3d 1096 is hereby amended as follows:

1) On 475 F.3d at 1099, the sentence beginning "Because our review . . ." is replaced with: "Because our review of an administrative agency's decision begins and ends with the reasoning that the agency relied upon in making that decision, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Ctr. for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1103-04 (9th Cir. 2006), we grant the petition for review, vacate EPA's approval of the amendment, and remand for EPA's reconsideration of SAFE's objections under a correct understanding of the preexisting Idaho SIP."

2) On 475 F.3d at 1099, the sentence beginning "Finally, we explain why our interpretation . . ." is replaced with: "Finally, we explain why our interpretation of the SIP as it existed at the time of the 2005 amendment resolves this case and requires that we grant the petition for review, vacate EPA's approval of the amendment, and remand for further proceedings."

3) On 475 F.3d at 1109-10, the sentence beginning "We therefore grant . . ." is replaced with: "We therefore grant SAFE's petition, vacate EPA's approval of the amendment, and remand to EPA for its consideration of Idaho's proposed amendment as a change in the preexisting SIP, rather than as simply a "clarification" of it."

4) On 475 F.3d at 1110, the final line of the opinion is changed to: "Petition for Review GRANTED; EPA's approval VACATED; REMANDED to EPA."

Petitioners' Petition for Panel Rehearing is DENIED as moot. No further petitions for rehearing or rehearing en banc will be accepted.

**OPINION**

BERZON, Circuit Judge:

The Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401-7671q, authorizes the creation of air quality standards for a number of pollutants, including particulate matter produced as a byproduct of burning. To implement these standards, the Act establishes a system of State Implementation Plans ("SIPs"), whereby states submit, subject to the United States Environmental Protection Agency's ("EPA") review and approval, proposed methods for maintaining air quality. Once approved by EPA these plans "[h]av[e] 'the force and effect of federal law.' " *Trs. for Alaska v. Fink*, 17 F.3d 1209, 1210 n.3 (9th Cir. 1994) (quoting *Union Elec. Co. v. EPA*, 515 F.2d 206, 211 (8th Cir. 1975), *aff'd*, 427 U.S. 246 (1976)).

In this case, we are presented with a preexisting SIP containing language that prohibits open burning generally and contains no exception allowing farmers to burn the residue left in their fields after harvesting their crops. Petitioner, Safe Air for Everyone ("SAFE"), challenges EPA's decision to approve an amendment to that SIP authorizing such burning. SAFE argues that certain CAA provisions which prohibit amending SIPs so that they interfere with meeting air quality standards forbid EPA's action, at least absent further analysis of field burning's impact on Idaho's air quality; EPA maintains that its approval of the amendment does not contravene any CAA provisions.

We hold that as it presently stands, EPA's approval is legally unsustainable. EPA grounded its approval of this amendment on the premise that the preexisting Idaho SIP did not ban field burning, so that the amendment only clarified what was already the case. This view of the preexisting SIP is one with which we cannot agree. Because our review of an administrative agency's decision begins and ends with the

reasoning that the agency relied upon in making that decision, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Ctr. for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1103-04 (9th Cir. 2006), we grant the petition for review, vacate EPA's approval of the amendment, and remand for EPA's reconsideration of SAFE's objections under a correct understanding of the preexisting Idaho SIP.

The current treatment of field burning in the Idaho SIP came about as the result of a thirty-five-year regulatory evolution. After reviewing the factual administrative record, we first explain the regulatory process established by the CAA and then trace the development of the current SIP provisions related to field burning in Idaho. We then closely examine how the preexisting Idaho SIP treated field burning prior to 2005, when EPA approved an amendment to the SIP that explicitly authorized the practice. Finally, we explain why our interpretation of the SIP as it existed at the time of the 2005 amendment resolves this case and requires that we grant the petition for review, vacate EPA's approval of the amendment, and remand for further proceedings.

## I.

### A.

Open burning of agricultural fields is a common practice in Idaho, particularly among bluegrass farmers in the northern portion of the state. Those farmers maintain that burning the grass residue improves the productivity of their fields and has certain environmental benefits, views with which the Idaho legislature has expressed agreement. *See* IDAHO CODE ANN. § 22-4801 (2006) ("The legislature finds that the current knowledge and technology support the practice of burning crop residue to control disease, weeds, pests, and to enhance crop rotations. . . . The legislature finds that due to the climate, soils, and crop rotations unique to north Idaho counties, crop residue burning is a prevalent agricultural practice and

that there is an environmental benefit to protecting water quality from the growing of certain crops in environmentally sensitive areas."); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1043-47 (9th Cir. 2004) (recognizing that "the Growers realize farming benefits from reusing grass residue in the process of open burning").

Despite these attested benefits, the administrative record establishes that such field burning is also a source of particulate matter that contributes to air pollution. SAFE submitted evidence indicating that the burning of agricultural fields in Idaho creates significant air quality problems. That evidence documents: (1) that clouds of smoke cover large portions of rural Idaho and surrounding states during burning season; (2) that area doctors believe that this smoke has had particularly severe health consequences for individuals with respiratory ailments; (3) that some individuals with such ailments have fled their homes during burning season to avoid the smoke; and (4) that a coroner's report linked at least one fatality to field burning. EPA has recognized that substantial pollution and health problems are created by the practice. *See* EPA, AGRICULTURAL BURNING: EPA MAKES NORTHWEST FIELD BURNING A TOP PRIORITY 2 (2000) ("[F]ield burning can cause serious environmental and health effects. . . . Scientific studies — along with thousands of complaints — indicate that smoke is unhealthy. . . . Exposure to fine particles, either alone or combined with other air pollutants, has been linked to difficulty in breathing, aggravated asthma, increased emergency room visits and hospital admissions, and, in some cases, premature deaths.").

## B.

Under the CAA, EPA has the authority to issue national air quality standards setting the maximum allowable concentration of a given pollutant. 42 U.S.C. § 7409(a).[1] Using this

---

[1] All citations to the United States Code refer to the 2000 edition, unless noted otherwise.

authority, EPA has issued limits for particulate matter. 40 C.F.R. §§ 50.6, 50.7.

To assure that such air quality standards are met, the CAA establishes a system heavily dependant upon state participation. *See* 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ."); *see generally Train v. Natural Res. Def. Council*, 421 U.S. 60, 64-70 (1975). As a central aspect of this system, states promulgate SIPs that "provide[ ] for implementation, maintenance, and enforcement" of the CAA's air quality standards within the state. 42 U.S.C. § 7410(a)(1). Although states retain significant flexibility in establishing the details of these plans, the CAA, and EPA regulations, outline many required features. *Id.* § 7410(a)(2) (6); 40 C.F.R. pt. 51. Among them is the mandate that state plans provide for regular revisions to reflect evolving air quality conditions and standards. 42 U.S.C. § 7410(a)(2)(H). These revisions need not be wholesale recastings of SIPs; instead, the CAA allows the states to submit, and EPA to review, piecemeal amendments dealing with discrete SIP provisions, leaving most of the plan untouched. *See Hall v. U.S. EPA*, 273 F.3d 1146, 1159-60 (9th Cir. 2001).

Before a SIP becomes effective, EPA must determine that it meets the CAA's requirements. 42 U.S.C. § 7410(k)(3). EPA must also approve plan amendments and "shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirement of [the CAA]." *Id.* § 7410(*l*).

## C.

Idaho, like every other state, was first required to submit a SIP to EPA within thirteen months of the Act's 1970 passage. *See Train*, 421 U.S. at 65. The original Idaho SIP was

approved by EPA in May 1972. Approval and Promulgation of Implementation Plans, 37 Fed. Reg. 10,842, 10,861 (May 31, 1972). A provision on open burning was among the Idaho state regulations incorporated into that SIP: "No person shall allow, suffer, cause or permit any open burning operation which does not fall into at least one of the categories of Section 3." Field burning was included in the types of burning allowed by Section 3, but with significant limitations:

> The open burning of plant life grown on the premises in the course of any agricultural, forestry, or land clearing operation may be permitted when it can be shown that such burning is necessary and that no fire or traffic hazard will occur. Convenience of disposal is not of itself a valid necessity for burning.
>
> 1.  It shall be the responsibility of any person conducting such burning to make every reasonable effort to burn only when weather conditions are conducive to a good smoke dissipation and only when an economical and reasonable alternate method of disposal is not available.
>
> 2.  When such alternate method is made available, it shall be put into use within a reasonable time.
>
> 3.  Any person conducting an agricultural, forestry, or land clearing burning operation similar to an operation carried out by a governmental agency shall follow the rules and procedures of the agency with regard to minimizing air pollution.
>
> 4.  When such burning creates air pollution or a public nuisance, additional restrictions may be imposed to minimize the effect upon the environment.

Section 3 also allowed eight other categories of open burning: food preparation and recreational fires; weed control fires; fires for firefighting training; industrial flares; residential solid waste disposal fires in rural areas; disposal site fires; junked motor vehicle fires; and orchard fires.[2]

In 1993, EPA approved amendments to the Idaho SIP that substantially changed the open burning provisions. *See* Approval and Promulgation of Implementation Plans, 58 Fed. Reg. 39,445, 39,446 (July 23, 1993) (noting that in Idaho's submission, "the existing Rules for Control of Open Burning and Categories of Allowable Burning were revised extensively" and that "[t]hese new and revised provisions for open burning comply with EPA's general requirements for SIP control strategies" (citations omitted)). These SIP provisions, incorporating section 01.01151.04(a) of Idaho air pollution regulations in effect on December 31, 1991, contained a general prohibition on open air burning:

> *No person* shall allow, suffer, cause or permit any open burning operation *unless it is a category of open burning set forth in Section 01.01153* and does not include any of the following materials:
>
> i.    Garbage;
>
> ii.   Dead animals or parts thereof;
>
> iii.  Junked motor vehicles or any materials resulting from a salvage operation;

---

[2]In 1982, EPA approved amendments to Idaho's SIP that incorporated Idaho's recodified air pollution regulations. *See* Approval and Promulgation of Implementation Plans, 47 Fed. Reg. 32,530, 32,531 (July 28, 1982). Those recodified regulations maintained the identical substantive language of the open burning regulations incorporated into the 1972 SIP, including the limited permission for field burning and permission for eight other categories of fires.

    iv.    Tires or other rubber materials or products;

    v.    Plastics;

    vi.    Asphalt or composition roofing or any other asphaltic material or product;

    vii.    Tar, tar paper, waste or heavy petroleum products, or paints;

    viii.    Lumber or timbers treated with preservatives;

    ix.    Trade wastes except as allowed in Section 01.01153;

    x.    Insulated wire;

    xi.    Pathogenic wastes; or

    xii.    Hazardous wastes.

(Emphases added). The revised regulation incorporated into the SIP listed categories of allowable burning that no longer included field burning. Instead, that list retained seven of the nine categories of permitted fires included in the 1972 SIP regulations — food preparation and recreational fires, weed control fires, fires for firefighting training, industrial flares, residential solid waste disposal fires in rural areas, disposal site fires, and orchard fires; omitted two categories of permitted fires from the 1972 list — junked motor vehicle fires and agricultural fires; and added three new categories of permitted fires — prescribed burning, dangerous material fires, and infectious waste burning.

In 2003, EPA approved another set of Idaho SIP amendments. Those amendments incorporated updated versions of Idaho regulations. This round of revisions, however, updated the open burning regulations only to reflect a recodification.

*See* Approval and Promulgation of Implementation Plans, 68 Fed. Reg. 2217, 2218 (Jan. 16, 2003) ("[S]ince EPA last approved the Idaho SIP in 1993, Idaho has revised nearly every section of its air quality rules to some degree. Many of these amendments have been editorial and are renumberings, changes to citations for cross-referenced rules or statutes, changes in terminology, or grammatical corrections."). The substantive language of the incorporated provisions on open burning was identical to the language approved in the 1993 SIP.

That 2005 rulemaking approved amendments to the SIP that added field burning as an eleventh category of allowed burning. The relevant provision, incorporating section 58.01.01.617 of the Idaho Administrative Code in effect on March 21, 2003, states: "The open burning of crop residue on fields where the crops were grown is an allowable form of open burning if conducted in accordance with the Smoke Management and Crop Residue Disposal Act and the rules promulgated pursuant thereto." (Citations omitted). Although Idaho first enacted statutes dealing with field burning in 1985 and amended them in 1986, 1999, and 2003, *see* Act of March 12, 1985, ch. 248, 1985 Idaho Sess. Laws 580 (codified as amended at IDAHO CODE ANN. §§ 22-4801 to -4804 (2006)), the SIP amendment approved by EPA in 2005 was the first explicit reference to those statutes in the SIP, *see* Approval and Promulgation of Air Quality Implementation Plan ("Final SIP"), 70 Fed. Reg. 39,658, 39,659 (July 11, 2005) (noting that the field burning legislation "was not [previously] specifically submitted to EPA as a SIP revision").[3]

SAFE submitted comments to EPA during the 2005 rule-

---

[3]Although Idaho's field burning statute was referenced in a 1993 report submitted to EPA detailing Idaho's strategy for bringing one portion of the state into attainment with particulate matter pollution standards, that strategy did not purport to alter the provisions of Idaho's statewide SIP, which contains the language banning field burning.

making process and now challenges EPA's approval of the amendment permitting field burning in this court. We have jurisdiction over SAFE's challenge to this 2005 rulemaking under 42 U.S.C. § 7607(b)(1). This court reviews EPA's decision to approve SIP amendments under the "arbitrary, capricious, or otherwise not in accordance with law" standard of the Administrative Procedure Act ("APA"). *Hall*, 273 F.3d at 1155; *see* 5 U.S.C. § 706(2)(A).

## II.

## A.

As detailed above, Idaho's 2003 SIP mandated that "[*n*]*o person* shall allow, suffer, cause or permit any open burning operation *unless it is a category of open burning set forth*" in ten specified sections that "establish categories of open burning that are allowed when done according to the prescribed conditions." (Emphases added). Those ten sections cover: "Recreational and Warming Fires"; "Weed Control Fires" for "abatement along fence lines, canal banks, and ditch banks"; "Training Fires" for firefighting training; "Industrial Flares"; "Residential Solid Waste Disposal Fires"; "Landfill Disposal Site Fires"; "Orchard Fires"; "Prescribed Burning" for fire management purposes; "Dangerous Material Fires"; and "Infectious Waste Burning." Field burning does not fit into any of these categories. EPA so acknowledged during the 2005 rulemaking proceedings. *See* Final SIP, 70 Fed. Reg. at 39,659 ("EPA recognizes the rule language . . . does not, on its face, appear to identify crop residue as a category of allowed burning"); *id.* at 39,660 n.1 (noting EPA's agreement with SAFE that field burning does not come within the "prescribed burning" exception). Nor is it debatable that field burning is an "open burning operation" covered by the SIP's expansive mandatory terms.

In short, given the SIP's broad prohibition and the absence of any pertinent exception, the plain meaning of the SIP, in

the clearest of terms, prohibits field burning. *Cf. Craft v. Nat'l Park Serv.*, 34 F.3d 918, 922 (9th Cir. 1994) ("[T]he regulation by its terms clearly prohibits appellants' activities. With two exceptions, the regulation prohibits 'dredg[ing] or otherwise alter[ing] the seabed in any way.' . . . There can be no question but that this language prohibits the excavation activities in which appellants were engaged." (second and third alterations in original) (quoting 15 C.F.R. § 935.7(a)(2)(iii) (1994))).

**[1]** In interpreting a SIP, we begin with a look toward the plain meaning of the plan and stop there if the language is clear. This much is clear from *Bayview Hunters Point Community Advocates v. Metropolitan Transportation Commission* (*BHPCA*), 366 F.3d 692 (9th Cir. 2004), a leading case in this court in which the meaning of a SIP was at stake. In considering the SIP for the San Francisco Bay Area related to transit ridership, *BHPCA* began by observing that "[w]e start with the plain language of [the SIP]. 'A regulation should be construed to give effect to the natural and plain meaning of its words,' " and then noted that "[t]he expected ridership increase was never described as anything more than a 'target.' " *Id.* at 698 (quoting *Crown Pac. v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)). Because the plan did "not, on its face, require a ridership increase of 15%," we held "[t]hat by its plain language [the SIP] does not establish a mandatory requirement to increase transit ridership by a specified percentage weighs heavily against the conclusion that such an obligation can be imposed based upon [the SIP]." *Id.* (internal quotation mark omitted); *see also Idaho Conservation League v. Boer*, 362 F. Supp. 2d 1211, 1216 (D. Idaho 2004) (refusing to defer to a state environmental agency's interpretation that "cannot be reconciled with the plain language of the regulations" included in the SIP); *United States v. Gen. Dynamics Corp.*, 755 F. Supp. 720, 723 (N.D. Tex. 1991) ("The [Texas state agency's] interpretation of the Texas SIP to allow plantwide averaging is unreasonable, because it contradicts specific lan-

guage of the SIP . . . ."); *Citizens for a Better Env't v. Deuk-mejian*, 731 F. Supp. 1448, 1454-55 (N.D. Cal. 1990) (refusing to credit evidence that the provisions of a SIP did not make a binding commitment when the SIP included "unequivocal[ ]" phrasing). Applying that same methodology here, we would quite readily conclude that the pre-2005 Idaho SIP did not permit field burning.

## B.

**[2]** EPA, however, assumed during the 2005 rulemaking proceedings that this clear-as-day prohibition of field burning does not resolve the meaning of the SIP as it existed as of the 2005 proceedings. Instead, the agency considered Idaho's "intent" in drafting the SIP, conducting "an examination of the State's overall approach to field burning" and "consider[ing] such things as the legislative history of Idaho's provisions related to agricultural burning and smoke management," various reports and plans prepared by the State, and various agreements signed by the State. Final SIP, 70 Fed. Reg. at 39,659. EPA also noted that its own past actions "indicate[ ] that EPA understood agricultural burning to be allowed in Idaho and that the SIP does not prohibit it."[4] *Id*. at 39,660. EPA did not, however, justify or explain this approach to interpreting a SIP, and the approach cannot be reconciled with the role of SIPs in the federal regulatory scheme.[5]

**[3]** Interpreting a similar state implementation plan scheme under the Clean Water Act,[6] the Supreme Court held that the

---

[4]None of these past actions, however, purported to interpret the relevant SIP provisions. Thus, there is no agency interpretation to which courts must afford deference on the determinative question in this case.

[5]Nor is there any indication that EPA has previously taken a position on the proper way to interpret a SIP. Given this vacuum, the case also does not implicate agency deference considerations on this key conceptual issue.

[6]Under the Clean Water Act,

Clean Water Act "effectively incorporates into federal law those state-law standards the Agency reasonably determines to be 'applicable.' In such a situation, then, state water quality standards — promulgated by the States with substantial guidance from the EPA and approved by the Agency — are part of the federal law of water pollution control." *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992) (footnote omitted). Similarly, a SIP, once approved by EPA, has "the force and effect of federal law." *Trs. for Alaska*, 17 F.3d at 1210 n.3 (quoting *Union Elec.*, 515 F.2d at 211) (internal quotation marks omitted). In accord with this general proposition, a state may not unilaterally alter the legal commitments of its SIP once EPA approves the plan. *See* 42 U.S.C. § 7416 ("[I]f an emission standard or limitation is in effect under an applicable implementation plan . . . such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan . . . ."); *Gen. Motors Corp. v. United States*, 496 U.S. 530, 540 (1990) ("There can be little or no doubt that the existing SIP remains the 'applicable implementation plan' even after the State has submitted a proposed revision.").

**[4]** Thus, the SIP became *federal* law, not *state* law, once EPA approved it, and could not be changed unless and until EPA approved any change. Consequently, the state's interpretation of the regulations incorporated into the SIP, even if binding as a matter of state law, is not directly dispositive of the meaning of the SIP.

---

"water quality standards" are, in general, promulgated by the States and establish the desired condition of a waterway. . . . [T]he Act requires, *inter alia*, that state authorities periodically review water quality standards and secure the EPA's approval of any revisions in the standards. If the EPA recommends changes to the standards and the State fails to comply with that recommendation, the Act authorizes the EPA to promulgate water quality standards for the State.

*Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (citing 33 U.S.C. § 1313).

**[5]** Accordingly, we look to the standards governing the interpretation of federal regulations. As a general interpretative principle, "the plain meaning of a regulation governs." *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002). Other interpretative materials, such as the agency's own interpretation of the regulation, should not be considered when the regulation has a plain meaning. *See id.* (citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)); *see also Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning.").

**[6]** The plain language of a regulation, however, will not control if "clearly expressed [administrative] intent is to the contrary or [if] such plain meaning would lead to absurd results." *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987).[7] Although "clearly expressed . . . intent" of regulators therefore could overcome the plain meaning of a regulation, *see id.*, we have never considered how definitely and in what form such intent must be expressed. Doing so now, we conclude that the notice requirements of the APA, 5 U.S.C. §§ 552(a)(1), 553(b),[8] requires that some indication of the reg-

---

[7]*Dyer* uses the term "legislative intent," but then inquires into the intent of the promulgating executive agency, not that of Congress. 832 F.2d at 1066. That focus makes sense, so, for clarity, we use "administrative intent."

[8]As pertinent here, these requirements provide:

Each agency shall separately state and currently publish in the Federal Register for the guidance of the public —

. . .

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

ulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process. Otherwise, interested parties would not have the meaningful opportunity to comment on proposed regulations that the APA contemplates, *id.* § 553(c),[9] because

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

5 U.S.C. § 552(a)(1).

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include —

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. . . .

*Id.* § 553(b).

[9]That provision mandates:

After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

5 U.S.C. § 553(c). This opportunity for comment applies to SIP revisions. *Ober v. U.S. EPA*, 84 F.3d 304, 312 (9th Cir. 1996).

they would have had no way of knowing what was actually proposed. For, as the D.C. Circuit has observed:

> Courts' reliance on the "plain meaning" rule in this setting [of interpreting administrative regulations] is not a product of some fetishistic attraction to legal "formalism." In order to infuse a measure of public accountability into administrative practices, the APA mandates that agencies provide interested parties notice and an opportunity for comment before promulgating rules of general applicability. This right to participate in the rulemaking process can be meaningfully exercised, however, only if the public can understand proposed rules as meaning what they appear to say. Moreover, if permitted to adopt unforeseen interpretations, agencies could constructively amend their regulations while evading their duty to engage in notice and comment procedures. As applied to agency regulations, then, the plain meaning doctrine is an interpretive norm essential to perfecting the scheme of administrative governance established by the APA.

> . . . .

> . . . To protect the integrity of [the APA's required] procedures, we cannot permit an agency to rely on its unexpressed intentions to trump the ordinary import of its regulatory language.

*Exportal Ltda. v. United States*, 902 F.2d 45, 50-51 (D.C. Cir. 1990) (citations and emphases omitted).

Such a mode of interpretation is particularly sensible under the CAA, which requires that judicial challenges be filed within sixty days of a SIP's approval. 42 U.S.C. § 7607(b)(1). If an agency can promulgate a regulation with plain language that dictates one meaning but later interpret it according to an

intent indicated neither in the regulatory language nor in the promulgation documents, parties may depend on the plain meaning of the regulation in deciding not to launch a challenge within the prescribed time limit. If, later, the agency relies on an undisclosed intended meaning, interested parties might be foreclosed from challenging the regulation, contrary to the statutory permission to launch such challenges.[10]

[7] Here, following the plain language prohibiting field burning in Idaho's 2003 SIP does not produce "absurd results" or contravene the pertinent administrative history. *See Dyer*, 832 F.2d at 1066. As the administrative record of air quality and health problems created by field burning demonstrates, it is far from patently inconceivable that the federal air pollution law covering Idaho would ban a significant source of the state's particulate pollution. Indeed, one of Idaho's neighbors has enacted a broad ban, except in limited circumstances, on the open burning on farms that produce grass seed. *See* WASH. ADMIN. CODE 173-430-045 (2006). So the interpretation of the 2003 SIP mandated by its plain language is not absurd at all, much less sufficiently absurd to justify departure from a plain words interpretation. *See Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) ("[T]o justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense.").

[8] Likewise, no administrative intent expressed in an appropriate way contradicts the plain meaning of the SIP: None of the published notices that accompanied the consideration or adoption of Idaho's previous SIPs established any intent concerning field burning. Instead, EPA's purported intent to allow field burning in Idaho is demonstrated, if at all,

---

[10]When review is sought "based solely on grounds arising after such sixtieth day," the CAA also allows for the challenge to be "filed within sixty days after such grounds arise." 42 U.S.C. § 7607(b). We take no position on whether EPA's reliance on its previously undisclosed intent in approving a SIP could constitute "grounds arising after such sixtieth day."

only through informal materials such as letters and presentations and its silent acquiescence when approving certain anti-pollution strategies submitted by Idaho.[11] Although Idaho lawmakers and regulators made their intentions toward field burning known through more formal actions, such as enacting legislation and regulations allowing field burning, none of these measures were referenced in the published materials that accompanied adoption of the earlier SIPs.

## C.

For the first time on appeal, EPA proffers two additional reasons we should not rely on the plain meaning of the 2003 and earlier SIPs. We owe no deference to these *post hoc* litigating positions, adopted by counsel for EPA. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("[W]e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question . . . ."). We do not find EPA's arguments persuasive.

EPA argues, first, that giving effect to the plain meaning of a SIP contrary to the true intent of state policymakers would violate case law prohibiting EPA from enacting more stringent SIP provisions than those proposed by the state. *See Riverside Cement Co. v. Thomas*, 843 F.2d 1246, 1247-48 (9th Cir. 1988) (holding that EPA's approval of a SIP after removing a proviso submitted by the state was arbitrary and capricious); *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1035-36 (7th Cir. 1984) (holding the CAA's partial approval provision did not allow EPA to make a SIP stricter); *cf. Train*,

---

[11]EPA cites its approval of an area-specific plan that referenced Idaho's field burning statute, *see supra* note 3, to demonstrate that it understood prior to 2005 that field burning was not banned in Idaho. Final SIP, 70 Fed. Reg. at 39,660. EPA, however, did not refer to the provisions on field burning when explaining its decision to approve that strategy. *See* Approval and Promulgation of Sandpoint, Idaho, Air Quality Implementation Plan, 67 Fed. Reg. 43,006 (June 26, 2002).

421 U.S. at 79 ("[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation."); *Hall*, 273 F.3d at 1153 ("By virtue of the States' roles in devising a strategy and adopting an implementation plan, . . . '[i]t is to the States that the Act assigns initial and primary responsibility for deciding what emissions reductions will be required from which sources.' " (alteration in original) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 470 (2001))). Those decisions, however, interpreted the CAA's provisions concerning the authority of EPA to approve or deny SIPs. They are not relevant to the task presently before the court — interpreting SIP language that *was* originally proposed by the state. As to that endeavor, requiring states to express their intent understandably when submitting proposed SIPs in no way detracts from states' critical role in devising the strategy to be used in achieving the requisite air quality standards.

Second, EPA argues that crediting the SIP's plain meaning would contradict case law prohibiting EPA from approving SIPs based on "an elusive and illusory measure." *Riverside Cement*, 843 F.2d at 1248. In *Riverside Cement*, EPA approved a SIP that contained a provision that explicitly stated its operation was "contingent upon the results of ongoing factfinding." *Id.* at 1247 (internal quotation mark omitted). Because that provision, by its own terms, might never have become effective, the court held EPA could not rely on that provision in determining whether the SIP met the CAA's pollution reduction requirements. *Id.* at 1248. In this case, by contrast, nothing on the face of Idaho's SIP suggests that the field burning prohibition is in any way contingent or indefinite. The plan is therefore not illusory under our case law. Moreover, by relying on a SIP's explicit language to find it illusory, *Riverside Cement* supports our broader conclusion that the plain meaning of a SIP controls.

* * *

**[10]** In sum, we hold that SIPs are interpreted based on their plain meaning when such a meaning is apparent, not absurd, and not contradicted by the manifest intent of EPA, as expressed in the promulgating documents available to the public. Because the prohibitory language of the preexisting Idaho SIP plainly applies to field burning, federal law banned field burning in Idaho prior to EPA's 2005 approval of the SIP amendment.

## III.

In commenting to EPA about Idaho's proposed amendment to the SIP, SAFE maintained that its approval would weaken the prior SIP and thereby violate sections 110(*l*) and 193 of the CAA. Section 110(*l*) provides that EPA "shall not approve a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirement of this chapter." 42 U.S.C. § 7410(*l*). Section 193 provides that "[n]o control requirement in effect, or required to be adopted by an order, settlement agreement, or plan in effect before November 15, 1990, in any area which is a nonattainment area for any air pollutant may be modified after November 15, 1990, in any manner unless the modification insures equivalent or greater emission reductions of such air pollutant." *Id.* § 7515. In its 2005 approval of the amendment, EPA denied the amendment contravened either of these statutes. Final SIP, 70 Fed. Reg. at 39,659-60. SAFE now challenges those determinations. We do not reach those broad statutory challenges, except to hold that EPA's reasoning in rejecting them cannot be squared with our interpretation of Idaho's pre-2005 SIPs.

As we have explained, EPA's decision to approve the 2005 amendment to Idaho's SIP rested on the fundamental premise that "EPA does not believe that Idaho's *existing SIP* when viewed in its entirety prohibits the burning of crop residue."

*Id*. at 39,659 (emphasis added). EPA relied on this premise in rejecting SAFE's claims under sections 110(*l*) and 193. *See id*. at 39,660 ("The proposed SIP revision is merely a clarification *of the existing SIP* and does not change or otherwise relax an existing control measure and therefore will not interfere with any applicable requirements concerning attainment and reasonable further progress or other applicable requirement of the Act. EPA believes that the requirement of section 110(l) is satisfied." (emphasis added)); *id*. ("In sum, EPA believes that approving the proposed SIP revision does not change or alter the *existing SIP* in Idaho which does not prohibit burning of crop residue. . . . Therefore, the requirements of section 193 of the Act are satisfied." (emphasis added)). Moreover, EPA has continued to rely on the same logic in its brief to this court: "In approving [the 2005] amendment to Idaho's SIP, EPA understood it to be a clarification of *existing* state law and the *SIP*, governing open burning of crop residue. EPA's action to approve Idaho's SIP revision request *therefore* did not relax Idaho's *pre-existing SIP* with respect to open burning of crop residue, or any control requirements in the SIP that had been in effect before November 15, 1990." (Emphases added).

We must review the EPA's actions based on the "grounds . . . upon which the record discloses that its action was based." *Chenery*, 318 U.S. at 87; *see also Ctr. for Biological Diversity*, 466 F.3d at 1103-04. On one hand, that principle means that we can only uphold EPA's action "on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). On the other hand, it also means we must "remand to the agency for additional investigation or explanation" when the agency's analysis is incomplete after its flawed basis is removed. *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (internal quotation mark omitted)). The record demonstrates that because EPA based the action under review on its belief that the preexisting SIP did not ban agricultural burn-

ing, the agency did not address the question whether the 2005 amendment, if indeed a change, contravened the statutory requirements. We therefore cannot reach that question either.

**[11]** We have held EPA's conclusion that the preexisting SIP did not ban field burning legally erroneous. Because that flawed premise is fundamental to EPA's determination that it did not contravene sections 110(*l*) or 193 of the CAA by approving the 2005 SIP, EPA's outcome on those statutory interpretation questions is "arbitrary, capricious, or otherwise not in accordance with law" for the purposes of our review. *Hall*, 273 F.3d at 1155. We therefore grant SAFE's petition, vacate EPA's approval of the amendment, and remand to EPA for its consideration of Idaho's proposed amendment as a change in the preexisting SIP, rather than as simply a "clarification" of it. Final SIP, 70 Fed. Reg. at 39,660. Accordingly, we have no reason to interpret the meaning of either CAA provision relied upon by SAFE but will instead allow EPA the first opportunity to apply those provisions, this time in accord with the understanding that the preexisting SIP bans field burning while the proposed amendment clearly allows, and regulates, the practice.

Petition for Review GRANTED; EPA's approval VACATED; REMANDED to EPA.